In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-01-00120-CV


______________________________




THE COCA-COLA COMPANY, ET AL., Appellants



V.



HARMAR BOTTLING COMPANY, ET AL., Appellees




 


On Appeal from the 76th Judicial District Court


Morris County, Texas


Trial Court No. 17,569




 




Before Morriss, C.J., Ross and Carter, JJ.


Opinion by Chief Justice Morriss



O P I N I O N



 This appeal is brought by The Coca-Cola Company, Coca-Cola Enterprises, Inc., Coca-Cola
Bottling Company of North Texas, Ouachita Coca-Cola Bottling Company, Inc., Coca-Cola Bottling
Company of Shreveport, Paris Coca-Cola Bottling Company, Inc., and Sulphur Springs Coca-Cola
Bottling Company, Inc. (hereafter collectively "Coke"). Harmar Bottling Company, Royal Crown
Bottling Company, Inc., O-Mc Beverages, Inc., Bolls Distributing Company, and Hackett Beverages,
Inc. (hereafter collectively "Bottlers") sued Coke for restraint of trade, monopolistic practices, and
interfering with existing and prospective business relationships. After a two-month trial, the jury
awarded the Bottlers approximately $14.6 million in damages. (1)

 After the verdict and a subsequent hearing, the trial court enjoined Coke from prohibiting
retailers from a number of specified actions in marketing competitive soft drinks, requiring particular
placement of Coke's products, or requiring particular ratios of display or marketing between Coke's
products and competing brands of soft drinks. The injunction applies to retail outlets in the
"Relevant Geographic Territory" (2) (hereafter "Territory") and to a retailer with outlets both inside and
outside the Territory, but has no application to retailers solely outside the Territory. The injunction
has a seven-year life span and allows a request for reconsideration when half that period has elapsed. 
The trial court also awarded attorneys' fees of $500,000.00, apportioned among the various Bottlers.

BACKGROUND

 This lawsuit was brought by several different carbonated soft drink (hereafter CSD) bottlers
who sell (or sold) soft drinks in competition with Coke. The Bottlers alleged Coke was engaging
in unlawful business practices through "Calendar Marketing Agreements" (hereafter CMAs) that
were directed at marketing Coke's CSDs by effectively preventing retailers from selling competitors'
CSDs. Coke holds the franchises for Coca-Cola, Dr. Pepper, and other beverages for the Territory 
at issue, and Coke's own information shows Coke maintained a seventy-five to eighty percent share
of the area CSD market during the relevant times. 

 The Bottlers focused their claims on the content and nature of the CMAs used by Coke in
contracting with retailers. The CMAs do not just provide price breaks for quantity purchases, but
also require specific retailer marketing practices in order to obtain Coke incentives. Through a
combination of those marketing practices, the CMAs limit retailers' ability to market competitive
products. Testimony established the importance of visibility and accessibility in marketing soft
drinks. The contracts required retailers to place Coke products in "impulse zones" or "point of
purchase" areas, where decisions to make such purchases are often made. Such areas include coolers
or ice buckets near checkout stands and "endcaps" in high traffic areas funneled toward checkout
stands. Supermarket contracts required that, for every competitor's endcap, Coke was contractually
entitled to two or three endcaps. Coke contracted in a number of cases for "horizontal sets" in which
Coke products were placed in coolers between eye and thigh level and competitive products were
placed out of the line of sight. Retailers were also restricted from in-store advertising of competitive
brands through banners or "stand-ups."

 The evidence shows that, after Coke obtained its area, it broke with prior policy and refused
to allow cooperative advertising. Various of Coke's CMA retailers could not advertise or promote
any competitive national brand, including newspaper ads, in-store circulars, and signs, banners, and
signs reflecting the price of a competitor's product. A number of the CMAs barred retailers from
offering competitive CSDs at prices lower than Coke's prices. For example, under the contract with
Circle K, a retailer could not sell Pepsi twelve packs for less than Coke's twelve packs. Every
convenience store contract in the Paris market in 1997 and 1998 contained price restrictions similar
to the Circle K contract. 

 Coke argues that the types of restrictions applied to only certain weeks during the calendar
year. Yet, under the terms of those agreements, those "certain weeks" devoured much of the calendar
year and all of the prime time slots for selling cold drinks. The agreements required promotional
periods of forty-two to forty-six weeks, with Coke's stated goal being to obtain multi-year
agreements with the retailers.

 Some CMAs also contained terms requiring retailers to carry only Coke flavors. In addition,
Coke offered bonus funding to pay retailers who did not carry competitive brands. Effectively,
therefore, many customers could only purchase Barq's Root Beer, rather than A&W, or Minute Maid
Orange drink, rather than Sunkist or Welch's. Before Coke assumed its area and began enforcing
those marketing provisions in the Territory, Barq's and Minute Maid were not sold locally, and
A&W, Sunkist, and Welch's sodas were sales leaders. 

 The jury found the conduct constituted an unreasonable restraint of trade, monopolization
or attempted monopolization, and a conspiracy to monopolize, as to all of the Bottlers, and that it
interfered with existing or prospective business relationships between the Bottlers and retailers. The
jury then awarded damages for lost profits and future lost profits, and for lost franchise value. The
jury found Coke's conduct was a willful or flagrant violation of Texas Antitrust Laws, but did not
find that Coke acted with malice.


 THE ACT'S REACH


 Coke contends the trial court erred in its extraterritorial application of the Texas Free
Enterprise and Antitrust Act (hereafter the Act) in both awarding damages and rendering injunctive
relief. Coke takes the position that none of these agreements-to the extent they were implemented
in retail establishments outside the State of Texas-were actionable under that state statute. 

 The damages and injunctive relief were awarded for actions taken both in Texas and outside
the state (but within the regional territories of Coke). Coke's argument is based on the language of
the Act. Tex. Bus. & Com. Code Ann. § 15.04 (Vernon 2002) reads as follows:

 The purpose of this Act is to maintain and promote economic competition in trade
and commerce occurring wholly or partly within the State of Texas and to provide
the benefits of that competition to consumers in the state. The provisions of this Act
shall be construed to accomplish this purpose and shall be construed in harmony with
federal judicial interpretations of comparable federal antitrust statutes to the extent
consistent with this purpose. 

However, the Act also states:

 (b) No suit under this Act shall be barred on the grounds that the activity or
conduct complained of in any way affects or involves interstate or foreign commerce. 
It is the intent of the legislature to exercise its powers to the full extent consistent
with the constitutions of the State of Texas and the United States.


Tex. Bus. & Com. Code Ann. § 15.25(b) (Vernon 2002).

 Coke directs us to no cases so limiting the Act. It quotes only a part of Section 15.04
("within the State of Texas . . . benefits of that competition to consumers in the state"), while
ignoring the declared purpose of the Act, that is, maintaining and promoting competition in trade and
commerce occurring wholly or partly within the State of Texas. See Tex. Bus. & Com. Code Ann.
§ 15.04. 

 Coke cites Destec Energy, Inc. v. S. Cal. Gas Co., 5 F.Supp.2d 433 (S. Dist. Tex. 1997),
aff'd, 172 F.3d 866 (5th Cir. 1999), in support of its position that Act does not apply to any activity
outside of Texas. The trial court in Destec Energy did rule the Act inapplicable in that case, but we
have no doubt the Act would have been applied if any part of the commerce in question had occurred
inside Texas.

 The TFEAA states that it applies to commerce occurring in whole or in part in Texas.
Tex. Comm & Bus. [sic] Code Ann. § 15.04. Section 15.25(b) of the TFEAA does
not provide that any conduct that has some effect on a Texas entity is subject to Texas
antitrust laws. Tex. Comm & Bus. [sic] Code Ann. § 15.25(b). Rather, Section
15.25(b) states that conduct is not to escape application of the TFEAA merely
because it occurs in Texas and also affects or involves interstate commerce. The
conduct complained of in this case occurred in California. SoCalGas has taken no
action affecting the ability of Texas consumers to obtain the benefits of competition.
The application plaintiffs seek is inconsistent with the stated purpose of the TFEAA.


Id. at 464 (emphasis added).

 Coke also cites Oce Printing Sys. USA, Inc. v. Mailers Data Servs., Inc., 760 So.2d 1037
(Fla. Dist. Ct. App. 2000), in its attempt to exclude Act coverage to activity outside Texas. That case
refused certification of a national class action based on the language of the Florida Antitrust Act,
Florida Statutes Section 542.19, yet that statutory language differs from the Texas language. See 
Fla. Stat. § 542.19.

 The trial court's order certifies nationwide classes seeking relief pursuant to the
Antitrust Act. We conclude that the plain language of the Antitrust Act bars
certification of a nationwide class in this instance. 

 

 Section 542.18, Florida Statutes (1997), states: "Every contract, combination, or
conspiracy in restraint of trade or commerce in this state is unlawful." Section
542.19, Florida Statutes (1997), states: "It is unlawful for any person to monopolize,
attempt to monopolize, or combine or conspire with any other person or persons to
monopolize any part of trade or commerce in this state." In both sections, the phrase
"in this state" is placed so as to modify the terms "trade" and "commerce." Thus, it
appears from the plain language of the Antitrust Act that it is aimed at regulating
trade or commerce that occurs in Florida, regardless of where the contract,
conspiracy, or monopoly occurs. It is the effect on trade that must occur in Florida,
not the actions giving rise to the effect on trade.


Oce Printing Sys. USA, Inc., 760 So.2d at 1041. We conclude that case is not applicable to the issue
at hand.

 Finally, Coke cites Emergency One, Inc. v. Waterous Co., 23 F.Supp.2d 959 (E.D. Wis.
1998), in support of its position. That case addressed the extent to which Wisconsin Statutes
Sections 133.01-133.18 applies to commerce outside Wisconsin. Wis. Stat. §§ 133.01-133.18. The
trial judge extensively discussed Wisconsin antitrust law, including statutory amendments which
deleted "in this state," and concluded from legislative history that such deletion was not intended to
extend the geographic reach of the statutory scheme. We have reviewed that opinion and the salient
language of the statute there in question, and conclude it does not apply to the case at hand.

 The language of the Texas statute is clear in its intent to cover monopolistic practices in
commerce "occurring wholly or partly within the State of Texas." Numerous other states similarly
use statutory language explicitly extending state antitrust jurisdiction over commerce that is partly
or wholly within those states. See, e.g., Ariz. Rev. Stat. Ann. §§ 44-1402, 44-1403 (1994); Conn.
Gen. Stat. § 35-30 (1971); Idaho Code § 48-103 (2000); 740 Ill. Comp. Stat. Ann. 10/3; Mich.
Comp. Laws § 445.771 § 1(b) (1985); N. M. Stat. Ann. §§ 57-1-1, 57-1-2 (1987); N. D. Cent.
Code § 51-08.1-01 (1987); R. I. Gen. Laws § 6-36-7(b) (1979); S. D. Codified Laws § 37-1-3.1
(1977); and W. Va. Code § 47-18-4 (1978).

 This case certainly involves anticompetitive conduct that occurred partly in Texas and which
affects consumers in Texas and other states. A number of the retailers signed contracts with Coke
that covered their entire area, including stores in and outside of Texas. That necessarily affects
Texas commerce. Coke's position that the effects of competition appear and dissipate at state lines
is not tenable. Each contract was prepared and executed in Texas and provides that Texas law
governs it and any disputes arising thereunder. Having chosen Texas law for these particular
contracts, Coke cannot avoid the protections to Texas consumers provided by that same law. See
DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 677 (Tex. 1990).

 Further, we note that the Bottlers alleged violations under the parallel antitrust statutes of the
other states involved and that there was no contention at trial that the laws of those states differ from
that of Texas. In such a situation, we presume that the laws of those states are the same as ours. 
In re Marriage of M. C. & R. S., 65 S.W.3d 188, 194, n.2 (Tex. App.-Amarillo 2001, no pet.);
Pellow v. Cade, 990 S.W.2d 307, 312-13 (Tex. App.-Texarkana 1999, no pet.).


 INJUNCTION


 Coke also contends the trial court erred by granting an injunction ordering it not to engage
in specified actions in dealing with retailers in the relevant geographic market. Once a monopoly
or attempted monopoly is established, the Act permits both damages and injunctive relief. 

 Any person . . . whose business or property is threatened with injury by reason of
anything declared unlawful in . . . this Act may sue any person . . . to enjoin the
unlawful practice temporarily or permanently. In any such suit, the court is to apply
the same principles as those generally applied by courts of equity in suits for
injunctive relief against threatened conduct that would cause injury to business or
property.


Tex. Bus. & Com. Code Ann. § 15.21(b) (Vernon 2002); see Zenith Radio Corp. v. Hazeltine
Research, Inc., 395 U.S. 100, 130 (1969) (injunction authorized on demonstration of significant
threat of injury from impending or ongoing violation).

 Coke contends the injunction is improper as a matter of law because it extends beyond the
boundaries of the State of Texas. (3) This argument is the same one previously discussed, and we will
not address it again.

 We review the grant or denial of a permanent injunction for an abuse of discretion. 
Operation Rescue-Nat'l v. Planned Parenthood, 975 S.W.2d 546, 560 (Tex. 1998); Beathard Joint
Venture v. W. Houston Airport Corp., 72 S.W.3d 426, 432 (Tex. App.-Texarkana 2002, no pet.). 
Injunctive  relief  may  only  be  granted  on  a  showing  of  (1)  a  wrongful  act,  (2)  imminent
harm, (3) irreparable injury, and (4) the absence of an adequate remedy at law. Jim Rutherford Invs.,
Inc. v. Terramar Beach Cmty. Ass'n, 25 S.W.3d 845, 849 (Tex. App.-Houston [14th Dist.] 2000, pet.
denied). Because we conclude that there is sufficient evidence to support the jury's findings of at
least one wrongful act and that harm is not only imminent, but ongoing, we focus on the existence
of irreparable injury and the availability of an adequate remedy at law. 

 The Bottlers presented evidence during the course of this trial showing that Coke's conduct
gave it a great deal of control over the retail market for this type of beverage and that the competitive
positions of the Bottlers were seriously injured by those actions. The Bottlers argue these injuries
are of a type that cannot be easily quantified and that will continue unless Coke is enjoined from
continuing the acts for which it was penalized in this lawsuit. The Bottlers also correctly point out
that consumer perception is a key ingredient in marketing products and argue that loss of advertising
opportunities and shelf placement have caused relatively immeasurable levels of damages to their
future activities. Thus, they argue, enjoining Coke from continuing these activities is the only way
to give them the opportunity (not the certainty) of regaining some portion of what they have lost.

 We agree. It would be foolish to award damages against Coke for past actions, but then
allow Coke to continue those same actions in the future, with the only constraint being the possibility
of some future litigation. See R.J. Reynolds Tobacco Co. v. Phillip Morris, Inc., 60 F.Supp.2d 502,
509 (M.D.N.C. 1999).

 Coke also complains the injunction improperly provides relief to parties who did not seek
relief, i.e., other bottlers such as Pepsi. On a policy level, this argument fails. As pointed out by the
United States Supreme Court in Zenith Radio Corp., 395 U.S. at 130-31, such injunctive remedies
are provided not just for private relief, but also to "serve as well the high purpose of enforcing the
antitrust laws." The injunction thus serves the public interest and was appropriately directed not just
to protect the Bottlers, but all competitors.

 Coke also contends the injunction is overly broad because it covers areas in which some of
the Bottlers have gone out of business and no current Bottler is presently doing business. For the
reasons set out above, we find the trial court acted within its discretion by enjoining Coke from
continuing to act in the fashion condemned by the jury, even in portions of the Territory where no
Bottler is presently doing business.


 EVIDENCE


 Coke asserts the evidence, adduced during a trial of approximately two months, does not
support (4) the jury's findings.


 
 The Bottlers' Expert Witness
 


 Connected with its attack on the evidence, Coke contends our review of the evidence for
sufficiency should disregard the testimony of Harmar's economist, Dr. David McFarland, because
the underlying basis on which his opinions rested was not adequately shown to be reliable. Coke
complains McFarland's opinion is entitled to no weight because he did not conduct any research or
analysis except for reviewing documents produced by Coke during discovery. Coke argues that his
opinions were not reliable because he used neither "recognized methodology nor reliable data." 
However, Coke admits that the data used by McFarland was the data Coke itself provided in
response to discovery. Coke also complains that McFarland failed to summarize or chart his
opinions and that he did not analyze the effects of the terms of the agreements. Although this
contention is placed in Coke's complaint about McFarland's unreliable opinions, it is actually a
question involving the sufficiency of the evidence, rather than addressing the underlying question
of the expert's ability to make those opinions. 

 Coke does not contend McFarland's qualifications are inadequate. Coke relies on cases
holding that either unsound data or an unreliable methodology applied to sound data may render an
opinion unreliable. See Austin v. Kerr-McGee Ref. Corp., 25 S.W.3d 280, 288 (Tex.
App.-Texarkana 2000, no pet.). Coke mentions in passing that the testimony "should not have been
admitted" (in those words, and no more, citing Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579
(1993)). Coke does not otherwise contend the trial court erred by allowing McFarland to testify. We
note that Coke's argument is titled "The Testimony of Plaintiffs' Economist Is Entitled to No
Weight."

 A fair reading of Coke's contention of error is that McFarland's testimony is not believable
because it was not sufficiently supported by underlying data or application of proper methods to the
data, and that the evidence is therefore insufficient to support the verdict. Coke's discussion in its
reply brief argues that McFarland specified no particular demonstrated methodology or data to
support his opinion and that his opinion was therefore inherently unreliable, despite his
qualifications. In a single line, Coke adds that the opinions of Harmar's expert on damages, Robert
Williams, were likewise not entitled to any weight on appeal. 

 Before a witness may testify as an expert about scientific, technical, or other specialized
matters, the witness must be qualified as an expert. United Blood Servs. v. Longoria, 938 S.W.2d
29, 30-31 (Tex. 1997). Whether a witness is sufficiently knowledgeable to be considered an expert
is preliminarily a question for the trial court. Id.; see Tex. R. Evid. 104(a). Additionally, the
qualifications of the expert must be measured against the particular opinions offered. Broders v.
Heise, 924 S.W.2d 148, 153 (Tex. 1996). The determination of whether an expert witness is
qualified to testify is left largely to the trial court's discretion, and we will not disturb it on appeal
absent a showing that the court abused that discretion. Id. at 151; E. I. du Pont de Nemours & Co.
v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995). In determining whether an abuse of discretion
occurred, we look to see whether the trial court acted without reference to guiding principles or rules.
Robinson, 923 S.W.2d at 558. 

 The proponent of an expert bears the burden of showing that the expert witness' testimony
is qualified, relevant to issues in the case, based on a reliable foundation, and helpful to the trier of
fact. Tex. R. Evid. 702; Guadalupe-Blanco River Auth. v. Kraft, 77 S.W.3d 805, 807 (Tex. 2002);
Robinson, 923 S.W.2d at 556. (5) The offering party is required to establish that the expert has the
knowledge, skill, experience, training, or education regarding the specific issue before the trial court
which would qualify the expert to give an opinion on that particular subject. Broders, 924 S.W.2d
at 153. 

 Coke argues that, without personal hard data and research on CSD markets, any opinion 
McFarland might give cannot be considered sufficiently reliable to be admitted as probative
evidence. Counsel elicited extensive information about McFarland's qualifications as an economist
and professor of economics over a long and distinguished career and his fifteen years of experience
analyzing  the  economics  of  marketing  CSDs.  The  underlying  foundation  of  his  testimony  is
his (1) training and experience, (2) personal observations of the market in this case and the results
of soft-drink marketing strategies in other geographic market areas, and (3) review of documents
provided by Coke during discovery.

 In approaching this case, McFarland testified, he used methodology accepted in his discipline
and adopted the product market definition as "branded CSDs," the same one adopted by the Bureau
of Economics of the Federal Trade Commission. For his work on this case, McFarland reviewed a
large number of depositions taken in this case, several marketing agreements, and had available to
him thousands of pages of documents and records produced in this case. McFarland's opinions in
this case were formed as an economist, experienced in antitrust matters, relying on information he
gathered, facts gathered specific to this case, and deposition testimony and documents reviewed by
him from this case. He testified it is normal for antitrust economics experts to review and rely on
evidence specific to the case. McFarland reviewed assessments and analyses of the market made by
parties to this case, specifically including a study by Delta Beverage Company. He believes he
followed accepted and recognized standards in determining the relevant geographical market. He
saw no need to go further in obtaining information to enable a conclusion as to whether Coke
possessed market power, since with just the market data available in this case, one can appropriately
evaluate anti-competitive conduct on the part of the firm with a seventy percent market share. He
indicated he is familiar with and followed the principles and procedures recognized in the field in
forming his opinions rendered in this case. He answered numerous questions about economics in
general, and competition and monopoly power specifically. Considering and applying accepted
principles of antitrust economics, in the geographic and product markets at issue, the branded CSDs
in the counties depicted in Plaintiffs' Exhibit Number 409, McFarland expressed the opinion that the
CMAs are consistent with an attempt by a monopolizer to gain control of the retail level of the chain
of distribution. Based on his education and training in economics, his experience with other cases
involving branded CSDs, his study of the branded CSD markets, accepted principles of antitrust
economics, and his review of materials in this case, he rendered the opinion that Coke is
monopolizing or attempting to monopolize the market in question, especially considering that its
market share is seventy-five to eighty percent and has been growing. He stated that the existence of
these CMAs with "draconian" provisions limiting competition and "just about blocking any
competitors from entering the market demonstrates to me that Coke intends to do just that." If left
unchecked, he believes Coke will monopolize the market. We have recounted in this paragraph just
some of McFarland's testimony. More has been itemized in our appendix attached to this opinion. 
 The trial court must make the threshold determination of whether the testimony meets both
the relevancy and reliability standards for admissibility under Rule 702. Robinson, 923 S.W.2d at
557. The Texas Supreme Court has set forth six nonexclusive factors to aid courts in determining
whether scientific testimony is reliable: (1) the extent to which the theory has been or can be tested;
(2) the extent to which the technique relies on the expert's subjective interpretation; (3) whether the
theory has been subjected to peer review or publication; (4) the technique's potential rate of error;
(5) whether the underlying theory or technique has been generally accepted by the relevant scientific
community; and (6) the nonjudicial uses which have been made of the theory or technique. Id.; see
also Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 726 (Tex. 1998) (Robinson factors
not always appropriate for assessing reliability of expert testimony). An expert's opinion may be
based on information perceived by, reviewed by, or made known to the expert. Tex. R. Evid. 703.

 Coke complains that the expert based his opinions only on his experience and economics
background or his study of the subject and that this is insufficient to make his opinion sufficiently
reliable to justify admission. Under Coke's contention, only opinions based on concrete proof and
capable of scientific testing may be considered sufficiently reliable to be admissible into evidence. 
That is not required. See Kumko Tire Co. v. Carmichael, 526 U.S. 137, 148-50 (1999).

 McFarland's opinion is based on his observations of the results of similar marketing strategies
and advertising campaigns over a period of time. Marketing consumer goods is as much an art form
as a scientific undertaking and is not subject to precise numerical calculation, especially if analyzed
on a clause by clause basis. In this case, the marketing theories espoused by McFarland have been
tested for decades in the court of human behavior. Subjective interpretation is certainly a part of
McFarland's analysis, but only on the narrow aspects of each marketing device, not on their broad
impact. The forces that shape consumer markets have been tested by retailers and consumers in
capitalistic societies since they existed. The testimony was that the concepts central to McFarland's
testimony have been accepted and applied in the business community for some time, and none of
these theories were created for litigation, but to sell products. For additional detail, please see the
appendix to this opinion.

 Considering the factors set out by Robinson, 923 S.W.2d at 557, we find the trial court did
not abuse its discretion by admitting McFarland's testimony. It is the jury's domain to weigh that
testimony.


 
 Violation of the Act
 


 Coke contends the evidence is factually and legally insufficient to support the jury's finding
that Coke's conduct constituted an unreasonable restraint of trade under the Act. See Tex. Bus. &
Com. Code Ann. §§ 15.01-15.26 (Vernon 2002). The Act prohibits as unlawful "[e]very contract,
combination, or conspiracy in restraint of trade or commerce." Tex. Bus. & Com. Code Ann. §
15.05(a). (6) We interpret the Act to harmonize with interpretations of similar federal antitrust statutes. 
Abbott Lab., Inc. v. Segura, 907 S.W.2d 503, 505 (Tex. 1995); Caller-Times Pub. Co. v. Triad
Communications, Inc., 826 S.W.2d 576, 580 (Tex. 1992).

 To establish a violation of Section 15.05(a) of the Act, a plaintiff must prove the challenged
restraint of trade is unreasonable and has an "adverse effect on competition" in the relevant market. 
DeSantis, 793 S.W.2d at 688; Winston v. Am. Med. Int'l, Inc., 930 S.W.2d 945, 952 (Tex.
App.-Houston [1st Dist.] 1996, no writ). "Without a showing of actual adverse effect on
competition, [a plaintiff] cannot make out a case under the antitrust laws." MJR Corp. v. B & B
Vending Co., 760 S.W.2d 4, 22-23 (Tex. App.-Dallas 1988, writ denied).


 
 
 Foreclosure
 
 


 Coke argues that, because there is no or insufficient evidence to show that the other Bottlers
were completely or at least predominantly "foreclosed" from competition, the Bottlers cannot recover
under antitrust theories. In support of that argument, they direct this Court to our Gonzalez v. San
Jacinto Methodist Hosp., 880 S.W.2d 436 (Tex. App.-Texarkana 1994, writ denied), opinion and
to Concord Boat Corp v. Brunswick Corp., 207 F.3d 1039 (8th Cir. 2000). 

 In Gonzalez, an anesthesiologist claimed that an exclusive contract between a hospital and
an anesthesia group unreasonably restrained trade. We upheld the summary judgment in the
hospital's favor because the agreement was limited to a single hospital and because there was no
evidence of foreclosure within the relevant market area. 

 Concord Boat used several criteria to evaluate the reasonableness of a contract, including the
extent to which competition has been foreclosed in a substantial share of the relevant market, the
duration of any exclusive arrangement, and the height of entry barriers. Concord Boat also rejected
the plaintiff's argument that a discount program (based on percentage of engines purchased from the
defendant) was unlawful because it put the retailers in "golden handcuffs" that had the effect of
preventing the retailers from purchasing engines from other manufacturers.

 We did not suggest in Gonzalez, nor did the Eighth Circuit in Concord Boat, that proof of
complete foreclosure was a necessity in all monopoly actions. Each monopoly claim necessarily
rests on its own facts and on the cause as pled.

 Similarly, in three other cases cited by Coke, federal courts focused on particular aspects of
competitive behavior involving exclusionary conduct involving vending machines and shelf space, (7)
allegations that the contract limited availability of adequate shelf space, storage, and display space,
combined with artificially lowered prices, (8) and the use of contracts including advertising feature and
volume incentive programs that required the retailer to feature only that bottler's soft drinks in its
flyers and advertisements during a specific number of weeks in order to obtain rebates from the
bottler. (9) 

 This case differs from those cited by Coke because in this case all of those factors and more
were brought together in a single type of agreement. This case focuses not on a single marketing
tactic used by Coke, but on a number of tactics (10) used as a package by Coke. Further, although
some of the contracts had single-year terms, many had multi-year terms, and Coke's stated goal was
for multi-year agreements. In addition, though the contracts are terminable on short notice by either
party, the evidence also shows that the only retailer who did cancel the agreement suffered an
immediate increase in cost of Coke products from $16.50 per case to $19.50 per case and that Coke
refused to negotiate any other discounts with that retailer. We conclude complete foreclosure is not
essential to recovery. See Brown Shoe Co. v. United States, 370 U.S. 294, 328-29 (1962). 
Nonetheless, Coke contends the evidence does not support the verdict on various elements of the
Bottlers' case.

 2. Restraint of Trade

 Coke contends there is no or insufficient evidence to support the jury's finding that Coke
engaged in an unreasonable restraint of trade. The term was defined for the jury in terms of the Act,
which requires plaintiffs to prove the "relevant market" (both product and geographic), a
substantially harmful effect on competition in that market, and that the harmful effect on competition
outweighs any beneficial effect on competition. Coke attacks the sufficiency of evidence to prove
each element.

 McFarland testified that the branded CSD industry considers itself a separate product market,
and its members direct their advertising and promotional activities against their national rivals, not
against private label CSDs or other beverages. He pointed out that Coke focused its marketing
information on its share in the branded CSD market in this region (not overall "beverage" market).
McFarland also testified that the channels of distribution were different from those of other
beverages because they were distributed by bottlers with exclusive territorial franchises, and that the
Neilson company, which tracks market shares, separates CSDs from other types of beverages in its
research.

 Scott Holloway, a manager for Coke, testified as an adverse witness that, in Coke's contracts,
CSDs were treated as a separate type of beverage than other beverages and that national franchised
brands are handled differently than store brands. 

 Coke states that the undisputed evidence was that national brand carbonated beverages
compete with many other beverages (or, "all varieties of liquid refreshments"). In the broadest sense,
that is obviously correct: a person could choose to drink anything from water, to carbonated water,
to a sports drink, to any of the spectrum of carbonated drinks, to beer, wine, or liquor. However, the
mere fact that a particular bottler sells a variety of types of beverages does not mean those beverages
are interchangeable. Indeed, the advertising and marketing plans clearly reflect an entirely
understandable desire to keep each branded type of product separate in the eyes of the public. It is
inconsistent for Coke to now take the position that these types of drinks are interchangeable. Even
its more limited suggestion that the beverage market for carbonated soft drinks necessarily includes
national brand, private label, noncarbonated soft drinks, and bottled water is more expansive than
is made evident by Coke's own marketing efforts.

 Coke correctly points out that there are statements in evidence from various sources reflecting
the existence of competition between various types of beverages. At most, however, this creates a
fact issue for the jury. 

 It is ultimately the decision of consumers as to what constitutes a particular product market. 
Although manufacturers, wholesalers, or retailers may wish to spin a particular market definition,
it is the individuals who actually purchase the product who really define the scope of
market-because they are the market. See Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795,
803 (8th Cir. 1987). In some circumstances, it might be necessary for detailed studies and market
reviews to be provided as evidence that a particular market segment exists. We are unconvinced that
such is necessary where the product market is one so generally well known and familiar as in this
case. We have already concluded that McFarland's testimony was admissible and could be
considered by the jury. His testimony, in combination with the other evidence cited above,
adequately supported the jury's determination.

 Coke next argues there was no evidence of the range of the geographic market. The jury
instructions defined the geographic market as "the area in which the defendants face competition
from suppliers in the relevant product market and to which retailers can practicably turn for
supplies." Coke argues there is no or insufficient evidence to show this geographic market because
McFarland's testimony was linked to the Bottlers' Territory.

 The cases do not attempt to restrict this determination in the fashion that Coke seeks to
implement here. The cases more generally describe the geographic market as the area of effective
competition in which the particular product or its reasonably interchangeable substitutes are traded. 
See Caller-Times Pub. Co., 826 S.W.2d at 608, n.14, citing United States v. E. I. du Pont de
Nemours & Co., 351 U.S. 377 (1956). (11)
 

 The franchise territories are readily ascertainable areas in which exclusive distributorships
exist for both Coke and the Bottlers. The evidence is that they are not identical, but that they overlap
significantly and roughly cover the same area. Coke points out that, on the fringes of the Territory,
it is possible for consumers to purchase from distributors outside the Territory. Although that is
likely true, in this context it is not particularly relevant in the absence of any proof that the "outside"
distributors/bottlers have a major impact on this geographic market. Further, in light of our previous
conclusion that the jury could conclude that private label CSDs are not part of this market, the
testimony that retailers could purchase them from distributors outside this geographic area is not
controlling to the analysis.

 Coke next complains that the jury's finding of restraint of trade is unsupported by the
evidence for several different reasons. It argues that the CMAs, as a matter of law, do not foreclose
competition because they (mostly) last only a year and because the retailers had the option to end the
contract. It also complains (as discussed above) that the evidence does not show complete restraint
(foreclosure) because contracts differed from store to store and because every contract did not
contain all of the terms set out in the factual summary above. It also complains (in connection with
McFarland's testimony as discussed above) the evidence is insufficient because there is no statistical
reporting or summary to show the number of stores to which each contract term applied or to show
the impact each term had on sales in those particular stores. 

 In the context of this argument, the actual focus should be on the question answered by the
jury: whether the activities of Coke constituted an unreasonable restraint of trade. As set out in the
factual summary above, those activities are reflected by Coke's contracts with retailers and the
actions taken to obtain those contracts, as well as the limited testimony about the result of
terminating such a contract. The effect of Coke's actions is shown, in this case, not by statistical
projections or forecasts or other inherently speculative mathematical models, but by market share. 

 As part of the nature of this type of action, with multiple contracts at issue with multiple
retailers, there is no single "smoking gun." The range of contract clauses that could be read to
restrict trade and impact competition is set out above, ranging from limitations on shelf space and
placement, to advertising requirements and limitations on both external and in-store advertising of
competitors' products, to exclusive-flavor provisions, to pricing requirements that ensured Coke
products would have a price advantage over other soft drinks. Its enforcement of the anticompetitive
provisions of those contracts was also in evidence, as was its response to a single instance in which
a retailer terminated one of the contracts.

 In application, Coke argues that each factor involving foreclosure should be considered
separately and without reference to any other factor or proof. That method of factual analysis is not
appropriate for this type of case. In antitrust/monopoly/restraint of trade situations, as in all
sufficiency of the evidence reviews, evidence of various factors supporting a jury's answer to a
question is not compartmentalized, but we review the evidence as a whole. See Cont'l Ore Co. v.
Union Carbide & Carbon Corp., 370 U.S. 690, 699 (1962).

 Coke also argues that the CMAs resulted in lower prices for consumers and thus do not
support an action of this nature, since the basic purpose of the Act is to provide lower prices for
consumers. We disagree. The purpose of the Act is to "maintain and promote economic
competition." Tex. Bus. & Com. Code Ann. § 15.04. Although that would often include lower
prices, we believe public policy logically would encourage maintenance of more than one real
supplier of a type of product. That is the very heart of the concept of "harm to competition."

 The question is whether all of this evidence is legally and factually sufficient to support the
verdict. Even if we found reason to wholly disregard McFarland's testimony, which we do not, there
would be some evidence to support the jury's finding on restraint of trade. Although any one of the
factors set out above might be insufficient to allow the jury to conclude Coke had acted to restrain
trade, due to the numerous factors presented in evidence, it is not appropriate to take this
determination out of the hands of the jury. This was a multi-week jury trial with considerable
evidence about these issues. We find the evidence both legally and factually sufficient to support
the jury's answer.


 
 
 Monopoly
 
 


 Coke also contends the jury's next two answers are unsupported by evidence. In those
answers, the jury found Coke's conduct constituted (1) monopolization or attempted monopolization
and (2) a conspiracy to monopolize.

 The Act prohibits monopolies or attempts to monopolize. Tex. Bus. & Com. Code Ann.
§ 15.05(b). To establish an illegal monopoly, a plaintiff must show (1) the defendant's possession
of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that
power as distinguished from growth or development as a consequence of a superior product, business
acumen, or historical accident. Caller-Times Pub. Co., 826 S.W.2d at 580. To prove attempted
monopoly, a plaintiff must show (1) the defendant has engaged in predatory or anticompetitive
conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving
monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). 

 The difference between actual monopoly and attempted monopoly rests in the requisite intent
and the necessary level of monopoly power. Image Technical Servs., Inc. v. Eastman Kodak Co.,
125 F.3d 1195, 1202 (9th Cir. 1997); Chromalloy Gas Turbine Corp. v. United Techs. Corp., 9
S.W.3d 324, 327-29 (Tex. App.-San Antonio 1999, pet. denied). (12)

 Coke contends there was no evidence of any attempt to obtain, or possession of, monopoly
power in the market. Although there are a number of ways in which this argument could have been
pursued, Coke argues only that the evidence was insufficient to delineate the market area. That
contention was disposed of above and will not be revisited.

 Coke also argues that McFarland's testimony admitting Pepsi had entered into contracts
similar to those of Coke in areas within the geographic market necessarily causes McFarland's
testimony (that the agreements showed the existence of monopoly power) to have no weight. We
have reviewed the testimony at the cited locations. McFarland did testify that Pepsi had entered into
similar contracts within the area, in the context of his comments that he had never taken the position
that Coke had agreements with "absolutely every store in the convenience store chains and
supermarket chains and independent stores. That probably is never going to happen." McFarland
agreed that Pepsi had a good market share (about fifteen percent to Coke's seventy-five to eighty
percent) and that Pepsi aggressively sought favorable treatment. That testimony does not so
contradict his testimony about the effect of Coke's strategies on market share as to negate its weight. 
Further, contrary to Coke's position, the evidence that other Bottlers have attempted to aggressively
compete with Coke does not mean that Coke does not have monopoly power. It means that other
Bottlers are attempting to sell their product. 

 There is testimony from other sources that a bottler with an eighty percent share of the market
could impose its contract terms on retailers and that at least one retailer felt compelled to accept
CMA terms that excluded drinks the retailer would have preferred to sell. There was also testimony
that Coke targeted one Bottler with the intention of taking it out of competition, because shortly after
Coke acquired its area, the Bottler's RC Cola brand appeared on a local sales survey. 

 We find there is some evidence to support the jury's finding, and the evidence is sufficient
to support the jury's answer on this issue.

 In a lengthy sidebar argument, Coke also contends the previously cited Louisa Coca-Coca
Bottling case is so on point with this case that we should find in Coke's favor as a matter of law. In
that federal district court case, the plaintiff (in that case a Coca-Cola dealership) acknowledged that
not all CMAs were anticompetitive. In that summary judgment, the district court refused to
eliminate all CMAs and pointed out that Louisa's damages evidence was solely of projected lost
profits. Coke essentially, in this argument, asks this Court to hold as a matter of law, generally, that
this type of cause of action cannot succeed if it is based to any extent on this type of contract
agreement. We will not so conclude. As previously discussed, such determinations are necessarily
fact-intensive and depend on the behavior in each case.


 
 
 Willful or Flagrant
 
 


 Coke next contends the jury's finding that Coke's conduct was a "willful or flagrant" violation
of Texas antitrust laws is not supported by the evidence. Coke relies on evidence that the Federal
Trade Commission advised in 1989 that CMAs in general were not illegal and that Coke's legal
department approved them. Bruce Hackett, however, testified that, during his employment with
Coca-Cola of Southwest Arkansas, he was trained and directed not to ask for exclusives or seek
agreements with a retailer to prevent it from selling other products because "it was considered
predatory, is what they told us, and puts you in danger of being sued." Those policies were, after
Coke took over, precisely the types of contract arrangements sought by Coke.

 The Bottlers also point out that a number of the CMAs contained clauses requiring minimum
prices that a retailer could charge for competing cola products, which could be construed as a form
of vertical price-fixing agreements. See Pace Elecs., Inc. v. Canon Comp. Sys., Inc., 213 F.3d 118,
120 n.2 (3d Cir. 2000). Coke also had a specific business plan designed as part of its contracts to
eliminate 7 UP from competition by requiring retailers to give Sprite additional (unearned) shelf
space, high visibility and traffic locations, and that word had been passed among Coke employees
to target Hackett Beverages for elimination from the Ark-La-Tex market because of its success in
competition, as well as the exclusive flavor provisions that the jury could have decided were
imposed for the purpose of eliminating otherwise popular beverages from store shelves. 

 Thus, there is evidence of knowledge that the nature of the activities was "predatory," of
plans by Coke to eliminate 7 UP from competition, and of exclusive flavor provisions, all of which
is evidence supporting the "willful or flagrant" jury finding. The contention of error is overruled.


 
 
 Causation
 
 


 Coke also argues briefly that there was no evidence to support the "cause in fact" aspect of
proximate cause. In order to recover, a plaintiff must establish that the monopolization was a
proximate cause of injury to the plaintiff. Hartz Mountain, 810 F.2d at 806-07; M.C. Mfg. Co. v.
Tex. Foundries, Inc., 517 F.2d 1059, 1063-64 (5th Cir. 1975).

 The Bottlers respond by reference to testimony by Hackett, one of the Bottlers. He testified
that in 1995 he had space in almost every convenience store in South Arkansas, with over fifty ice
barrels, but in 1996, only a few months after Coke began its operations in the Territory, retailers
began to refuse to allow him to put up signs or install ice barrels or other cold equipment, and that
he eventually had to remove his equipment (and in some instances, Coke removed it) because of the
new agreements. There is testimony that all Bottlers experienced loss of equipment, floor space, and
advertising because of exclusivity provisions in the CMAs, and that in the stores with exclusive-flavor terms, the Bottlers' Cadbury products (A&W, Sunkist, and Welch's) were completely
excluded, even though before those agreements were entered into, A&W had been the top selling
root beer in the Territory. 

 This testimony amply supports the proximate cause portion of the jury's verdict. It is further
buttressed by testimony that, in the one major account that refused to enter into CMAs with Coke,
the sales comparisons are substantially different and that they were substantially in Harmar's favor. (13)


 
 Tortious Interference
 


 Coke also contends the evidence does not support the jury's finding that it had wrongfully
interfered with existing business relationships. Coke attempts to recast this as interference with
contracts and argues that there were no Bottlers' CMAs in place with which it could interfere. That
is not what the jury was asked to find. We review the sufficiency of the evidence in light of the
charge actually given to the jury. Larson v. Cook Consultants, Inc., 690 S.W.2d 567, 568-69 (Tex.
1985). 

 From the evidence as set out above, the jury could have determined that Coke's purpose was
to find ways to interfere with those business relationships. The evidence is sufficient to support the
verdict on this point as well.


 
 Damages
 


 Coke next contends that evidence of damages was either speculative or improper and that it
therefore does not support the jury's award of damages. Coke contends the testimony of Harmar's
damages expert, Robert Williams, is entitled to no weight because his damages models are
fundamentally flawed. As with McFarland, Coke has mixed complaints about the admissibility of
Williams' testimony with its argument that his testimony should have no weight.

 Coke's base argument is that Williams' damages models for past and future lost profits and
lost franchise value was based on too many assumptions and therefore too unreliable to be worthy
of belief. (14) We disagree. Williams used a variation of the "before and after" method, which
compares profits before the violations with profits after the violations, to reach some of his
conclusions. (15) He also used historical trends in the business as shown by actual figures and posited
future increases as mathematical projections. The cases recognize the factual uniqueness of each
antitrust action and also recognize that methods of proof of damages must often be tailored to the
particular case. Thus, a mixture of different analyses can be entirely appropriate because, in this type
of action, the measure of damages is necessarily speculative. See Park v. El Paso Bd. of Realtors,
764 F.2d 1053, 1068 (5th Cir. 1985); Pierce v. Ramsey Winch Co., 753 F.2d 416, 439 (5th Cir.
1985). The purpose of requiring the calculations is to cut the degree of speculation so far as is
reasonably possible, but no case suggests it can be entirely eliminated. 

 Williams based his determinations on the profit records of the Bottlers before the acts, and
then projected sales if the activity had not occurred, less actual sales, then multiplied by profit factor
per case sold. He pointed out that no regional statistics were available, and he thus used the national
statistics that were available as predictive factors. 

 Coke contends this testimony is insufficient because it does not adequately pinpoint the
probable earnings of these particular companies in this particular region of the country. Specifically,
Coke complains that there were differences between national averages and these regional averages,
and that the national rates include growth rates of products that are not being sold by the Bottlers,
those products being Coca-Cola, Dr. Pepper, and Pepsi. Coke also argues its evidence that there
was some degree of mismanagement in the national RC organization that may have been responsible
for some of the losses incurred by Harmar. 

 With Williams' testimony as with McFarland's, we review the trial court's initial reliability
determination for abuse of discretion. The cases reflect that these damages models are time-tested
and appropriate, that they have been used in cases of this type, and that, because of the fact-intensive
questions in these cases, variations on these models are to be expected and are acceptable so long
as reasonable justifications for those variations are provided. See Park, 764 F.2d at 1068; Pierce,
753 F.2d at 439. We find the trial court did not abuse its discretion by admitting this evidence to the
jury.

 Coke also argues the trial court should not have awarded both future lost profits and loss of
franchise value. Future lost profits and loss of franchise value are separate measurements of loss and
were presented separately to the jury. Williams' testimony carefully delineated the various types of
losses. As pointed out by Harmar, Williams did not calculate franchise value for Hackett Beverages
because it is not a franchise, but O-Mc and Royal Crown Bottling Company had no future lost profits
because they went out of business-but did have loss of franchise value when they sold their
companies. The jury was instructed that those figures should not be combined, and we presume that
juries follow the courts' instructions. Daugherty v. S. Pac. Transp. Co., 772 S.W.2d 81, 83 (Tex.
1989); Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982);
County of Hidalgo v. Brown, 79 S.W.3d 721, 729 (Tex. App.-Corpus Christi 2002, no pet.).

 All of this information was presented to the jury. The evidence to which Coke refers is not
so controlling in nature to allow this Court to conclude that Williams' testimony should as a matter
of law be given no weight. The jury was presented with the different options and evidence and made
its decision based on that evidence. The evidence is factually and legally sufficient to support the
verdict.

 In a related argument, Coke complains that Harmar's expert did not attempt to divide out the
damages caused by improper conduct from damages caused by proper competition and argues that
caselaw requires such. (16) Proof of damages in an antitrust context is "rarely susceptible of the kind
of concrete, detailed proof of injury which is available in other contexts," and the burden of proving
such damages is not as rigorous as in other situations. Zenith Radio Corp., 395 U.S. at 123; New
York v. Julius Nasso Concrete Corp., 202 F.3d 82, 88 (2d Cir. 2000). The Second Circuit applied
this reasoning by remanding a case with directions that the plaintiff need only provide the court the
following: 

 [s]ome relevant data from which the district court can make a reasonable estimated
calculation of the harm suffered. In this way, the finder of fact can make "a just and
reasonable inference" of damages based on the proof available; to do otherwise
"would be a perversion of fundamental principles of justice [and would] deny all
relief to the injured person and thereby relieve the wrongdoer from making any
amend for his acts."


Julius Nasso Concrete Corp., 202 F.3d at 89. We find this to be an appropriate application of
damages theory in this context.

 Accordingly, though the evidence does not provide precise dollar values, because it presented
a reasoned extrapolation to the jury supported by hard evidence to a reasonable extent, we cannot
conclude the evidence is without weight. Thus we will not reweigh the evidence. That is the
province of the jury and is not within the scope of proper appellate review. The evidence is both
legally and factually sufficient to support the jury's award of damages.


 EFFECT OF SETTLING DEFENDANTS


 Coke also contends the trial court erred by failing to submit jury questions on liability and
comparative responsibility under Articles 32 and 33 of the Texas Civil Practice and Remedies Code
in connection with payments made by settling defendants. Tex. Civ. Prac. & Rem. Code Ann. arts.
32, 33 (Vernon 1997). Coke's argument is based entirely on its attempt to make "tort" claims
equivalent to "antitrust" claims. It has cited a number of cases in an attempt to support this position.
For example, Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S. 630, 634 (1981), is cited by Coke
for the proposition that antitrust laws are analogous to tort actions. (17)
 That theme is repeated in other
cases that acknowledge similarities between those two types of claims. See Mendelovitz v. Adolph
Coors Co., 693 F.2d 570, 578 n.18 (5th Cir. 1982); Erickson v. Times Herald Printing Co., 271
S.W.2d 329 (Tex. Civ. App.-Dallas 1954, writ ref'd n.r.e.). 

 Coke also argues that, because Chapter 33 applies to Deceptive Trade Practices Act claims,
it must also apply to statutory antitrust claims. Chapter 33 explicitly states that it applies to DTPA
claims, but makes no reference to antitrust actions. A brief review of Stewart Title Guar. Co. v.
Sterling, 822 S.W.2d 1, 6 (Tex. 1991), which was cited by Coke for this proposition, actually shows
that the Texas Supreme Court realized the contribution and comparative negligence statutes did not
cover all situations, but found a monetary offset was nevertheless appropriate in order to avoid an
improper double recovery by a plaintiff. 

 We find no requirement that comparative responsibility of settling defendants be used to
adjust awards in antitrust actions and, thus, overrule the contention of error.


 SETTLEMENT CREDITS


 Coke next contends the trial court erred in the manner in which it allocated a settlement credit
among the various Bottlers. Coke was given a dollar-for-dollar credit pursuant to its election, but
complains it was not given the opportunity to test the allocation of the credit among the various
Bottlers. It appears that the Bottlers' list was filed before judgment was entered.

 A defendant seeking a settlement credit has the burden to prove its right to such a credit. Utts
v. Short, 81 S.W.3d 822, 828 (Tex. 2002); Mobil Oil Corp. v. Ellender, 968 S.W.2d 917, 927 (Tex.
1998). Chapter 33 requires a written election only before the case is submitted to the fact-finder. 
Mobil Oil Corp., 968 S.W.2d at 927 (citing Tex. Civ. Prac. & Rem. Code Ann. § 33.014 (Vernon
1997)). Utts allows providing the information through either pre or post-verdict discovery, which
suggests, in this situation as well, that the nonsettling defendant was protected by making its timely
election and that the amounts could properly be sorted out at some point before the judgment was
signed.

 A losing defendant must certainly be allowed time to attack those allocations as a sham, see
Utts, 81 S.W.3d at 828, but the statute does not require that allocations be provided at any particular
point in time. Further, although Coke complains it had no opportunity to test the information, it has
not directed this Court to any location in the record where it sought such an opportunity or was
denied such by the trial court. We overrule this contention of error.


 JURY ARGUMENT


 Coke also contends that the Bottlers' counsel committed reversible error by making improper
final jury argument. Specifically, it complains counsel accused defense counsel of lying to the jury
during closing argument: "of being very good at twisting and distorting and misleading" and the
"[b]ig Lies" of defense counsel, the alleged misrepresentations of defense lawyers, and accusing
counsel of spreading a lot of fertilizer in the courtroom. 

 To  demonstrate  that  jury  argument  was  harmful,  a  party  must  demonstrate  (1)  an
error; (2) that was not invited or provoked; (3) that was (a) preserved by the proper trial predicate
such as an objection, a motion to instruct, or a motion for mistrial; (b) not curable by an instruction,
a prompt withdrawal of the statement, or a reprimand by the court; and (4) that the argument by its
nature, degree, and extent was harmful because it made a probable difference in a material finding. 
Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839-40 (Tex. 1979); Tex. Employers Ins. Ass'n v.
Puckett, 822 S.W.2d 133, 135 (Tex. App.-Houston [1st Dist.] 1991, writ denied).

 Coke did not object to the first statement. The contention of error was therefore not
preserved for appellate review. Tex. R. App. P. 33.1. It did object to the second statement, but did
so only after a substantial amount of intervening argument had been made. Objections must be made
promptly, so that a trial court may instruct a jury if improper argument is made. This contention has
likewise not been preserved for review. Id.

 Even if the claimed error was preserved for our review, in light of the extensive record (two-
month jury trial, twenty-five volumes of reporter's records), we do not believe any isolated
statements by counsel at final argument met the requisite reversal standard. An evaluation of harm
must cover the whole case, which begins with the voir dire and ends with closing argument. The
complainant must show that the probability the improper argument caused harm is greater than the
probability the verdict was grounded on the evidence. Reese, 584 S.W.2d at 840. The test is
whether a juror of ordinary intelligence could have been persuaded by the argument to agree to a
verdict contrary to that to which he would have agreed but for such argument. Gannett Outdoor Co. 
v. Kubeczka, 710 S.W.2d 79, 86-87 (Tex. App.-Houston [14th Dist.] 1986, no pet.). We cannot
conclude that these isolated instances so persuaded the jury. We overrule this contention of error.


 ATTORNEYS' FEES


 Coke also contends there is no evidence to support the trial court's award of attorneys' fees
(for the injunctive proceeding) because the only evidence of such fees was the affidavit of attorney
Tom Stanley. It is clear from the record, however, that the trial court did not rely on that affidavit
for its award. The trial court stated it was taking judicial notice of its file and the proceedings before
it, and then found that a reasonable attorneys' fee was $500,000.00. 

 A reviewing court will not overturn a trial court's allowance of attorney's fees unless the
award constitutes a clear abuse of discretion. Ross v. 3D Tower Ltd., 824 S.W.2d 270, 273 (Tex.
App.-Houston [14th Dist.] 1992, writ denied). The test for whether the trial court abused its
discretion is whether it acted without reference to any guiding rules and principles, that is, whether
the court's action was arbitrary or unreasonable. Downer v. Aquamarine Operators, Inc., 701
S.W.2d 238, 241-42 (Tex. 1985); Long Trusts v. Atl. Richfield Co., 893 S.W.2d 686, 688 (Tex.
App.-Texarkana 1995, no writ).

 "[R]easonableness of attorney's fees is a question of fact to be determined by the trier of the
facts and must be supported by competent evidence." Peeples v. Peeples, 562 S.W.2d 503, 506 (Tex.
Civ. App.-San Antonio 1978, no writ). Expert testimony is necessary to establish reasonableness
of attorney's fees. See Woollett v. Matyastik, 23 S.W.3d 48, 52 (Tex. App.-Austin 2000, pet.
denied). In general, a trial court may not adjudicate reasonableness on judicial knowledge and
without the benefit of evidence. Great Am. Reserve Ins. Co. v. Britton, 406 S.W.2d 901, 907 (Tex.
1966); In re T.L.K., 90 S.W.3d 833, 841 (Tex. App.-San Antonio 2002 no pet. h.); Woollett, 23
S.W.3d at 52. 

 Chapter 38 of the Texas Civil Practice and Remedies Code contains an exception to this
general rule, but is applicable only to the types of claims described in Section 38.001. Tex. Civ.
Prac. & Rem. Code Ann. §§ 38.001-38.006 (Vernon 1997). Because this claim is not a claim
described in Section 38.001, the trial court erred in awarding attorney's fees absent any evidence to
support a finding that such fees were reasonable. See Gorman v. Gorman, 966 S.W.2d 858, 866
(Tex. App.-Houston [1st Dist.] 1998, pet. denied) (judicial notice of attorney's fees authorized only
in claims described by Chapter 38, not declaratory judgment actions).

CONCLUSION

 That portion of the trial court's judgment awarding attorneys' fees is reversed and remanded
to the trial court for further proceedings. See Long Trusts, 893 S.W.2d at 688.

 We affirm the judgment in all other respects.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: April 16, 2003

Date Decided: July 17, 2003



APPENDIX

The Bottlers' economic expert, Dr. David McFarland, testified to the following:

1. He has been, since 1964, a professor of economics at the University of North Carolina at Chapel
Hill, who does some consulting in the antitrust field, primarily to obtain information to use in his
courses.


2. He has mostly taught industrial organization and micro-economics, the subject matter of which
courses is foundational to antitrust principles.


3. He has worked numerous times as a consultant and expert witness in a large number of cases
involving antitrust issues.


4. Beginning in 1965, he has been retained in litigation four or five times specifically to address the
effects of CMAs in the CSD industry.


5. The November 1999 staff report issued by the Bureau of Economics of the Federal Trade
Commission, titled "Transformation and Continuity: The U.S. Carbonated Soft Drink Bottling
Industry and Antitrust Policy Since 1980" (Plaintiffs' Exhibit Number 4, of which the trial court took
judicial notice), concluded that, for antitrust analysis of soft drinks, a proper product market
definition is the "branded CSD" market.


6. The federal district court in Charlotte, North Carolina, approved the same product market
definition of "branded CSDs" for antitrust analysis.


7. In approaching this case, McFarland used methodology accepted in his discipline and adopted the
same product market definition, "branded CSDs."


8. For his work on this case, McFarland reviewed a large number of depositions taken in this case,
numerous marketing agreements, and had available to him thousands of pages of documents and
records produced in this case.


9. McFarland's opinions in this case were formed as an economist, experienced in antitrust matters,
relying on information he gathered, facts gathered specific to this case, and deposition testimony and
documents reviewed by him from this case.


10. It is normal for antitrust economics experts to review and rely on evidence specific to the case.

11. McFarland reviewed assessments and analyses of the market made by parties to this case,
specifically including a study by Delta Beverage Company. 


12. McFarland saw information that each of the parties, plaintiffs and defendants, had defined
franchise territories.


13. To his knowledge, all CSD franchisers grant exclusive distributorships to their distributors.


14. These exclusive territories, of the plaintiffs and defendants, are the appropriate bases to use to
define the relevant geographical market for antitrust analysis.


15. He believes he followed accepted and recognized standards in determining the relevant
geographical market.


16. To address monopoly, you must define the market, which requires both a product definition and
a geographical region within which competition is supposed to operate.


17. In documents, Coke itself used a seventy percent figure to represent Coke's market share.


18. A seventy percent market share is significant because that empowers the firm with that share to
persuade customers on matters. One with a small share would not have the same persuasive power.


19. He saw no need to go further in getting information to enable a conclusion about whether Coke
possessed market power. With just the market data available in this case, one can appropriately
evaluate anticompetitive conduct on the part of the firm with a seventy percent market share.


20. He is familiar with and followed the principles and procedures recognized in the field in forming
his opinions rendered in this case.


21. Defining a product market cannot be done by a clear formula.


22. The product market should be defined as "nationally advertised" (or branded or nationally
branded) carbonated soft drinks.


23. One factor in defining the product market is advertising comparisons, and one only sees
comparisons between branded CSDs, not between a branded CSD and a beverage outside that
definition.


24. To determine the geographic market in this case, it is given that Congress has authorized
exclusive distributorship territories in this industry, and that is the form the industry has taken-
exclusive distributorships.


25. The appropriate geographic market in this case is the exclusive territories of the plaintiffs.


26. Since he first was involved as an expert on antitrust issues in CSD litigation, in Charlotte in
1984, he invariably notes displays of CSDs and competitive issues at play in the market.


27. McFarland answered numerous questions and answers about economics in general, and
competition and monopoly power specifically.


28. He has formed understandings about the CMAs in use by Coke in the relevant markets at issue
in this case.


29. All CMAs are not alike, and not all are harmful, but it depends on the details of the CMAs.


30. The elements in CMAs that restrict what retailers can do with regard to the competitors' products
tend to be anticompetitive and tend to foreclose the market.


31. Considering and applying accepted principles of antitrust economics, in the geographic and
product market at issue, the branded CSDs in the counties depicted in Exhibit Number 409, the
CMAs are consistent with an attempt by a monopolizer to gain control of the retail level of the chain
of distribution.


32. That is because they contain exclusionary provisions such as restricting competitors' access to
the retail marketplace.


33. On specific features in CMAs in this case, he is of the opinion that the following provisions are
anticompetitive and create barriers to competition, based on the principles of antitrust economics:


 a. Offering incentives not to carry competitive brands such as preferred availability
agreements (putting competitive products in less accessible or less visible places) and exclusive
flavor agreements.


 b. Restrictions on competitors' displays (anticompetitive to differing degrees, depending on
the degree of the restrictions, partial to complete).


 c. Horizontal sets, in which a product is (exclusively) placed in the "eye-to-thigh" location.


 d. A requirement of seventy-five to eighty percent of the cold vault space in a particular
store.


 e. Long, exclusive promotional periods (the longer, the more anticompetitive).


 f. A "40-week exclusive all or nothing" provision that exclusive newspaper advertisements
by the retailer tie Coke's product to the advertisement and allow no other branded CSDs to be
advertised during the exclusive periods (because competitors cannot get promotions for forty weeks
out of the year).


 g. Prohibition of outside (the retail store) advertising of competitive brands.


 h. Prohibition of inside (the retail store) advertising of competitive brands.


 i. Exclusive "cold equipment" located at point of sale areas in retail stores to capture the
impulse buying of branded CSDs.


 j. Requirements for minimum ratios of Coke versus competitors' products in vending
machines and cold equipment inside or outside retail stores.


34. The anticompetitive provisions in the CMAs have a cumulative effect on inhibiting competition.


35. He agrees with Coke's assessments that:


 a. The positioning of products in the selling zone (within six feet of the register) in a
convenience store is very important.


 b. Sixty percent of customers in convenience stores never go past the cash register area, the
impulse zone, and the average consumer spends one and one-half minutes in line at the cash register
of the average two and one-half minutes in the store.


 c. CSDs are the highest impulse category product in convenience stores, with eighty-one
percent of all purchases of CSDs made on impulse.


36. The higher the proportion of retail stores in a market that sign a CMA with Coke, the more
anticompetitive effect and the greater the barriers to competition those CMAs will have.


37. The CMAs in question are artificial barriers to competition in that Coke, with its market power,
requires the retailers, in order to do business with Coke, essentially to exclude other nationally
branded CSD advertising or carry only Coke flavors.


38. Coke's entering into these CMAs with independent grocery stores and independent convenience
stores is consistent with an attempt to monopolize the market for branded CSDs in this market.


39. Based on his education and training in economics, his experience with other cases involving
branded CSDs, his study of the branded CSD market, accepted principles of antitrust economics, and
his review of the materials he reviewed in this case, McFarland is of the opinion that Coke is
monopolizing or attempting to monopolize the market in question, especially considering that its
market share is seventy-five to eighty percent and has been growing. The existence of these CMAs
with "draconian" provisions limiting competition and "just about blocking any competitors from
entering the market" demonstrates to him that Coke intends to do just that. If left unchecked, he
believes Coke will monopolize the market.


40. Because of Coke's actions to attempt monopolization, the plaintiffs have been injured.
1. Under the judgment, that sum is subject to reduction due to settlement credits to
approximately $13.8 million.
2. The "Relevant Geographic Territory" is defined as the exclusive franchise territory of the
Bottlers and is defined in the judgment as eleven counties in Texas, three counties in Oklahoma,
twenty-one counties in Arkansas, and five parishes in Louisiana.
3. We point out to counsel and to the Bar that Tex. R. App. P. 9.4(i) specifically provides that
the use of footnotes as a method of avoiding the limits of the rules is a ground for striking briefs. 
In a forty-page reply brief (which is already fifteen pages in excess of the proper length), Coke's
counsel added sixty footnotes totaling approximately 320 lines of type. Most of those "footnotes"
are actually additional argument and in some instances appear to be footnoted points of error. They
will not be considered as such nor addressed. We also point out that 320 additional lines of type,
using a smaller typeface than the body of the brief, is the equivalent of adding-at the very least-an
additional sixteen pages to an already overly lengthy brief. Such practice will not be condoned by
this Court in the future.
4. When deciding a no-evidence point, in determining whether there is no evidence of
probative force to support a jury's finding, we must consider all of the evidence in the record in the
light most favorable to the party in whose favor the verdict has been rendered, and we must apply
every reasonable inference that could be made from the evidence in that party's favor. Merrell Dow
Pharma., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997). In this review, we disregard all
evidence and inferences to the contrary. Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499
(Tex. 1995); Best v. Ryan Auto Group, Inc., 786 S.W.2d 670, 671 (Tex. 1990). 

 When considering a factual sufficiency challenge to a jury's verdict, we must consider and
weigh all of the evidence, not just that evidence which supports the verdict. Mar. Overseas Corp.
v. Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998). Courts of appeals can set aside the verdict only if it
is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and
unjust. Id.; Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). Courts of appeals are not fact-finders. 
Accordingly, courts of appeals may not pass on the witnesses' credibility or substitute their judgment
for that of the jury, even if the evidence would clearly support a different result. Mar. Overseas
Corp., 971 S.W.2d at 407; Clancy v. Zale Corp., 705 S.W.2d 820, 826 (Tex. App.-Dallas 1986, writ
ref'd n.r.e.).
5. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993); E. I. du Pont de
Nemours & Co. v. Robinson, 923 S.W.2d 549, 557 (Tex. 1995); Spivey v. James, 1 S.W.3d 380
(Tex. App.-Texarkana 1999, pet. denied).
6. The Act is undergirded by a constitutional prohibition. The Texas Constitution declares that
"monopolies are contrary to the genius of a free government, and shall never be allowed." Tex.
Const. art. I, § 26.
7. Bayou Bottling, Inc. v. Dr. Pepper Co., 725 F.2d 300, 304 (5th Cir. 1984).
8. Louisa Coca-Cola Bottling Co. v. Pepsi-Cola Metro Bottling Co., 94 F.Supp.2d 804 (E.D.
Ky. 1999) (summary judgment).
9. Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp., 653 F.Supp. 1144 (S.D. Ohio 1986)
(injunction denied).
10. See appendix to this opinion, detailing McFarland's testimony.
11. See United States v. Grinnell Corp., 384 U.S. 563 (1966); Walker Process Equip., Inc. v.
Food Mach. & Chem. Corp., 382 U.S. 172 (1965); State v. Coca-Cola Bottling Co. of S.W., 697
S.W.2d 677, 681 (Tex. App.-San Antonio 1985, writ ref'd n.r.e.).

12. Once a monopoly or attempted monopoly is established, the Act permits recovery of
damages as well as injunctive relief. Injunctive relief is available to a plaintiff if a violation of the
Act threatens it with injury. Coke complains about the injunctive relief in a later point of error.

13. That account is Wal-mart. 
14. Coke has relied in part on Burroughs Wellcome for its argument that Williams' testimony
is so unsupported as to be without any possible weight. In that case, the court held that a doctor's
testimony was no evidence that Polysporin spray caused Crye to sustain a frostbite injury. "When
an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts,
the opinion is without probative value and cannot support a verdict or judgment." Burroughs
Wellcome citing Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199, 202-05 (Tex. 1980)
(reviewing substance of medical expert's testimony and holding testimony constituted no evidence
of causation, as it was based on assumptions, possibility, speculation, and surmise). Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 499-500 (Tex. 1995). That differs from this situation
because this expert linked his damages report to these particular facts, but used his expertise to
extrapolate from the information available. Testimony of medical causation with no underlying
foundation is a situation that cannot be applied to the case at hand.
15. The other major model is the "yardstick" method (comparable businesses) to reach other
conclusions. Those methods are described as the two most widely accepted methods for measuring
damages in antitrust actions. See Park v. El Paso Bd. of Realtors, 764 F.2d 1053, 1068 (5th Cir.
1985); Pierce v. Ramsey Winch Co., 753 F.2d 416, 439 (5th Cir. 1985). 
16. Coke also complains because the expert did not specify which of its marketing tactics
caused damages and because he did not specify the dollar amount of damages caused by each clause
of the contract. Such specific delineation is not required.
17. Tex. Indus. points out that contribution was not available because Congress had not
provided for contribution in antitrust actions and that application of such theories to damage
recoveries was a matter for Congress to decide. Tex. Indus., Inc. v. Radcliff Materials, Inc., 451 U.S.
630 (1981). Neither Congress nor the Texas Legislature have added language to either federal or
state antitrust statutes to permit contribution.