IN THE SUPREME COURT OF TEXAS






IN THE SUPREME COURT OF TEXAS
 
════════════
No. 03-0737
════════════
 
The Coca‑Cola Company et al., 
Petitioners,
 
v.
 
Harmar Bottling Company et 
al.,
Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Sixth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued November 9, 
2004
 
Justice Brister, joined by Chief Justice Jefferson, Justice O’Neill, and 
Justice Medina, dissenting.
 
After buying 
up distributors of the leading soft drink brands in the Ark-La-Tex area, Coke 
began demanding that retailers stop advertising competing brands, stop selling 
some of them, and artificially raise the prices of the rest. Retailers who 
refused to play along were punished with higher wholesale prices; only Wal-Mart 
(a behemoth in its own right) successfully refused.
There is a 
line between competing and bullying, and the jury found that Coke crossed it. As 
evidence in the record would allow reasonable jurors to reach that conclusion, I 
would not render judgment to the contrary; because the Court does, I 
respectfully dissent. 
I. Choice of Law is not Jurisdictional
This suit 
concerns competition in 40 counties, 11 of which are in Texas. The Court vacates 
most of the jury’s verdict because it concerns counties outside Texas, holding 
that Texas courts have no jurisdiction of such claims. This jurisdictional 
ruling is unprecedented. 
I agree Texas 
law cannot extend beyond the limits of our sovereignty,[1] cannot punish foreign conduct that was 
legal where it occurred,[2] cannot govern foreign conduct that has 
no effect here,[3] and cannot regulate prices in foreign 
stores merely because Texans might shop there.[4] But this verdict was not limited to 
Texas law. 
The bottlers 
asserted Texas law applied, but pleaded alternatively that the laws of Arkansas, 
Louisiana, and Oklahoma outlawed the same conduct. They asserted that our 
neighbors’ antitrust laws were the same as our own, and Coke never denied it. 
The jury simply found that Coke unreasonably restrained trade and monopolized 
the relevant markets. Unless our sister states define monopolies or restraints 
of trade differently than we do, it makes no difference whether the jury’s 
findings were based on Texas law or some other.[5]
The trial 
court’s punitive damages question did ask jurors if Coke wilfully and flagrantly 
violated Texas antitrust laws, and part of its prolix instructions defined 
“trade” and “commerce” as “economic activity undertaken in whole or in part for 
the purpose of financial gain involving or relating to any goods or services 
within the State of Texas.” But in conducting a proper choice-of-law analysis, 
“we must first decide whether Texas law conflicts with the laws of other 
interested states, as there can be no harm in applying Texas law if there is no 
conflict.”[6] Unless there is some conflict between 
the antitrust laws of Arkansas, Louisiana, Oklahoma, and Texas, we cannot 
reverse the jury’s verdict, as these two brief references to Texas made no 
difference.[7]
Instead of 
resolving this choice-of-law issue with choice-of-law rules, the Court treats it 
as a jurisdictional defect. Until today, no one has ever suggested the trial 
court had no subject-matter jurisdiction of this case. Certainly not Coke — its 
75 pages of briefing never mention “subject matter” and never once challenge the 
trial court’s jurisdiction. Coke instead argued below and argues here that Texas 
law does not apply to competition in markets outside Texas.[8] That is a choice-of-law issue, not one 
of subject-matter jurisdiction. 
The 
distinction is important because choice-of-law issues (unlike jurisdictional 
issues) can be waived, as Coke has done here. Coke maintains that it objected to 
the application of Texas law, but concedes that it never requested the 
application of any other state’s laws or offered proof of any of them. While the 
trial court could have judicially noticed those laws, it was not required to do 
so under Rule 202 of the Texas Rules of Evidence.[9] When a party fails to request judicial 
notice of the law of another state as permitted under Rule 202, “Texas courts 
will simply presume that the law of the other state is identical to Texas 
law.”[10]            

This 
presumption is much older than Rule 202 itself. We stated in 1895 that “[i]n the 
absence of proof the court will presume the law of another State to be the same 
as the law of this State . . .”[11] There could hardly be a clearer rule 
in the history of Texas jurisprudence; this Court has decided literally dozens 
of cases on precisely this presumption.[12] So has our sister court in criminal 
cases.[13] By failing to prove that Texas law 
conflicts with the laws of Arkansas, Louisiana, or Oklahoma, Coke has waived any 
claim that their laws and our laws are not the same. 
That is, 
until today. Although Rule 202 says a court shall take judicial notice 
upon request and may do so on its own motion, the Court now says that 
choice-of-law is jurisdictional (at least sometimes) so trial courts must 
analyze it in every case. If they do not, appellate courts may not 
bother looking for conflicts either (though Rule 202 appears to allow it)[14] and simply presume they are 
different. Not only does this reverse dozens of our own cases and our own rules 
of evidence, it allows appellate judges to dismiss jury verdicts on appeal — 
without notice or argument — whenever they think verdicts “dictate to other 
states what can and cannot be tolerated.”[15]
In this case, 
the Court’s new presumption turns out to be wrong. There is a very good reason 
why Coke never offered the laws of any other state at trial or on appeal: they 
all look alike. This is not surprising because most state antitrust laws are 
patterned on federal antitrust laws,[16] as the laws applicable here show:
Federal 
law:
Every 
contract, combination in the form of trust or otherwise, or conspiracy, in 
restraint of trade or commerce among the several States, or with foreign 
nations, is hereby declared to be illegal. . . . Every person who shall 
monopolize, or attempt to monopolize, or combine or conspire with any other 
person or persons, to monopolize any part of the trade or commerce among the 
several States, or with foreign nations, shall be deemed guilty of a felony. . . 
.[17]
 
Texas law:
Every 
contract, combination, or conspiracy in restraint of trade or commerce is 
unlawful. It is unlawful for any person to monopolize, attempt to monopolize, or 
conspire to monopolize any part of trade or commerce.[18]
 
Louisiana 
law:
Every 
contract, combination in the form of trust or otherwise, or conspiracy, in 
restraint of trade or commerce in this state is illegal. No person shall 
monopolize, or attempt to monopolize, or combine, or conspire with any other 
person to monopolize any part of the trade or commerce within this state.[19]
 
Oklahoma 
law:
Every act, 
agreement, contract, or combination in the form of a trust, or otherwise, or 
conspiracy in restraint of trade or commerce within this state is hereby 
declared to be against public policy and illegal. It is unlawful for any person 
to monopolize, attempt to monopolize, or conspire to monopolize any part of 
trade or commerce in a relevant market within this state.[20]
 
Despite these 
manifest similarities, the Court says we cannot presume that our neighbors’ laws 
are the same as our own because then we would have to presume that their laws 
were intended to protect competition in Texas, as our laws are. This is 
both unprecedented and unfair. Texas law — from abandonment to zoning — is 
generally intended to govern affairs in Texas; if the historic presumption 
required a showing that our sister states also intended to govern such affairs 
in Texas, it would never have been used. It is one thing to presume Texas 
laws are limited to Texas, but quite another to presume foreign laws are limited 
to Texas too.
The Court 
justifies all this on the basis that interstate comity requires abstention. 
“When there is parallel state and federal litigation . . . [c]omity or 
abstention doctrines may, in various circumstances, permit or require the 
federal court to stay or dismiss the federal action in favor of the state‑court 
litigation.”[21] But we have never adopted an 
“abstention doctrine” for disputes that cross state lines, and for several 
reasons should not start now.
            
First, we are not federal courts, and there is no parallel state litigation. 
Texas courts have generally considered comity only when there is a conflict 
between litigation in our courts and litigation elsewhere.[22] There is no such conflict here.
Second, 
federal abstention applies only to “difficult questions of state law bearing on 
policy problems of substantial public import whose importance transcends the 
result in the case . . .”[23] Until today, we have not hesitated to 
decide cases concerning robbery,[24] income taxes,[25] alimony,[26] and child custody[27] on the presumption that a sister 
state’s laws were the same as our own. And at least two Texas courts have done 
so in antitrust cases,[28] even if the parties did not cite to 
them. But now, unaccountably, soft drink sales present a policy problem of such 
“substantial public import” that no Texas court is competent to consider them. 
As the common law and common cases often “reflect fundamental policy choices,”[29] it is unclear after today’s decision 
what other claims against Texas residents cannot be brought in Texas courts. 

Third, 
today’s decision is inconsistent with federal law. The Sherman Act does not 
apply to conduct affecting only foreign markets because Congress passed a 
specific amendment saying so,[30] something the Texas Legislature has 
not done. The federal amendment was required so American businesses could 
compete in foreign markets, many of which allow price-fixing, monopolizing, and 
so on,[31] which interstate commerce does not. 
And the Supreme Court has specifically held that applying American antitrust law 
extraterritorially is not a jurisdictional problem,[32] and that American courts should defer 
to foreign antitrust laws only in cases of an unavoidable conflict.[33] We are supposed to construe Texas 
antitrust laws “in harmony with federal judicial interpretations,”[34] but today the Court calls its own 
tune.
Finally, and 
perhaps most important, the Texas antitrust statute specifically precludes 
judicial abstention. The statute plainly applies to “trade and commerce 
occurring wholly or partly within the State of Texas,”[35] and the Legislature stated in no 
uncertain terms that it intended Texas antitrust laws to govern commerce 
crossing state lines to the absolute limit of constitutional law:
 
No suit 
under this Act shall be barred on the grounds that the activity or conduct 
complained of in any way affects or involves interstate or foreign commerce. It 
is the intent of the legislature to exercise its powers to the full extent 
consistent with the constitutions of the State of Texas and the United States.[36]
 
Because 
neither Coke nor the Court suggests that the judgment here is unconstitutional, 
we cannot prudentially abstain from deciding this case without ignoring the 
Legislature’s express intent.
On occasion, 
comity and choice of law may suggest that a Texas court should dismiss a claim 
in favor of a foreign forum under principles of forum non conveniens.[37] But that is a matter of venue rather 
than jurisdiction,[38] and thus is waived if never 
requested. Moreover, other public and private interest factors must be balanced 
in that decision, factors that Coke never addresses. We should not reduce a 
doctrine this old to two factors favoring one party.
            
Nor should we make antitrust law inefficient, as its goal is the opposite. If 
state antitrust laws are a jurisdictional matter, separate suits will have to be 
brought in each state, even if (as here) they involve the same contracts, the 
same conduct, and the same parties. And no state court will have jurisdiction if 
a market straddles a state line, as many do.
The Court 
suggests that the bottlers should have filed in federal court. But Texas federal 
courts use the same jurors, identical statutes, and the same federal caselaw as 
do Texas state courts; it is hard to see why one imposes on our sister states 
any more than the other. Of course, federal courts can impose federal law across 
state lines, but the question here is who can impose Arkansas or Louisiana law 
on a Texas business; it is hard to see why federal courts are more qualified to 
do that. Moreover, federal courts already have exclusive jurisdiction of federal 
antitrust claims;[39] if they also have exclusive 
jurisdiction of most state antitrust claims, it is hard to see why so many state 
legislatures went to the trouble.
The 
Ark-La-Tex region is not a legal no-man’s-land; some law must apply even 
if Texas law does not. Coke may not escape liability by merely objecting to the 
application of Texas law; it had the burden of proving a conflict of laws that 
prevented the application of Texas law. By failing to do so, it waived any 
choice-of-law complaint.
II. Coke’s Conduct is not Legal
The Court 
renders judgment against the bottlers despite the jury’s verdict to the 
contrary, holding they did not prove Coke harmed competition rather than its 
competitors. But several of Coke’s activities in the Ark-La-Tex market were so 
anticompetitive that federal courts would not require such proof, and we should 
not either. 
On its face, 
Texas law (like the Sherman Act) prohibits all monopolies and agreements in 
restraint of trade. But consistent with federal law, the Texas Act was intended 
to outlaw only unreasonable restraints or illegal monopolization.[40] As a result, most claims under the 
Act should be analyzed under a “rule of reason” that takes into account the 
relevant market and industry conditions before and after the restraint, and the 
history, nature, and effect of the defendant’s conduct.[41] 
But some 
restraints are so anticompetitive and unjustifiable that they are deemed 
unlawful per se, and require no proof that competition has been harmed in a 
particular case.[42] “[W]hen a particular concerted 
activity entails an obvious risk of anticompetitive impact with no apparent 
potentially redeeming value, the fact that a practice may turn out to be 
harmless in a particular set of circumstances will not prevent its being 
declared unlawful per se.”[43] In such cases, “no elaborate study of 
the industry is needed to establish their illegality.”[44] “Among the practices which the courts 
have heretofore deemed to be unlawful in and of themselves are price fixing, 
division of markets, group boycotts, and tying arrangements.”[45]
I agree with 
the Court that Coke did not violate antitrust laws by paying for prime locations 
in retail stores, or shelf space equal to its market share. Such deals are 
commonplace, and antitrust law does not require Coke to assist its 
competitors.[46] There was no evidence here that the 
bottlers ever tried to purchase prime locations, or that they would have failed 
had they done so. These claims were subject to a rule-of-reason analysis, and 
fail for lack of proof that they affected prices or competition in the market as 
a whole.[47]
But the jury 
could have concluded from the evidence that Coke did far more than this. The 
Court declines to address any per se violations because the bottlers assert only 
violations under the rule of reason. But these are not separate causes of 
action; they are analytical categories used to decide whether conduct may be 
presumed to be anticompetitive, or must be shown to be so.[48] Deciding which applies is a question 
of law for the court,[49] so if the lower courts applied (or 
the parties argued) the wrong one, we may reverse only if it resulted in an 
erroneous judgment.[50] Here, the bottlers alleged and the 
jury found that Coke unreasonably restrained trade and monopolized markets; if 
there is evidence to support that verdict under either per-se or rule-of-reason 
analysis, we could not ignore it even if the bottlers had filed no briefs at 
all. 
A. Price Fixing
In some 
markets in the Ark-La-Tex region, Coke required that retailers price all other 
soft drinks higher than its own. Indeed, Coke sometimes specified that competing 
products had to be priced at least 304 higher than Coke’s. Coke 
could lower its prices to beat the competition, but paying retailers to raise 
its competitors’ prices is price-fixing, pure and simple, and it has been 
illegal for a long time.
For many 
years, all price-fixing agreements were deemed unlawful per se.[51] Indeed, they were the “archetypal 
example” of a practice without redeeming competitive value.[52]
In 1997 the 
Supreme Court made an exception for vertical[53] agreements fixing maximum prices, 
subjecting them to a rule-of-reason analysis.[54] As the Court noted, a price ceiling 
keeps consumer prices low, and thus does not generally threaten competition.[55] But a price floor keeps prices 
artificially high, and so remains illegal per se.[56] Because Coke’s contracts fixed 
minimum prices, there is no question they fall in the latter category.
Coke argues 
there was no evidence that all soft drink prices in the Ark-La-Tex region 
increased. But while the bottlers presented contrary evidence (which we must 
presume the jury credited), the main problem is that Coke’s agreements were 
illegal even if they lowered prices, as it is no defense to price-fixing that 
the prices fixed were reasonable.[57] 
Coke also 
argues that price-fixing is not illegal without a specified resale price. But 
agreement on a specific price is not required; an agreement that sets a floor on 
prices is illegal per se even if that floor sometimes varies.[58]
It can be 
argued that fixing minimum prices is sometimes procompetitive, as when a 
supplier wants dealers to furnish services they could not afford without a 
guaranteed margin.[59] But there is no evidence this is the 
case with soft drinks; moreover, Coke’s agreements sought to control not its own 
prices but those of its competitors. As the sole purpose of these agreements was 
to keep the price of all competing soft drinks higher than they otherwise would 
have been, they were illegal per se. 
B. Boycott
In a number 
of its agreements with convenience stores, Coke gave retailers a discount on 
best-selling drinks if retailers promised not to carry competitors to its new 
root beer, orange, and grape drinks. This is a boycott.[60] There was evidence a jury could 
credit (and we must presume they did) that once Coke obtained an 
exclusive‑flavor agreement, it typically raised its prices. This is 
anticompetitive.
Some boycotts 
are illegal per se, while others are subject to a rule-of-reason analysis. 
Generally, when boycotts (1) cut off access to “a market necessary to enable the 
boycotted firm to compete,” (2) are orchestrated by a firm with “[a] dominant 
position in the relevant market,” and (3) “are not justified by plausible 
arguments” of efficiency or competition, then a per se rule applies.[61] On the evidence introduced at trial, 
reasonable jurors could have concluded that Coke met all three requirements.
Generally, 
only horizontal boycotts are illegal per se, as a single customer may always 
choose to change suppliers (or vice versa).[62] But horizontal agreements need not be 
instigated by competitors; they can be imposed by dominant firms above or below 
them. Thus, for example, when a retailer persuaded its 10 manufacturers not to 
sell to the retailer’s small competitor, the Supreme Court used a per se 
analysis, rejecting as a matter of law a defense that the boycott did not hurt 
competition but only one competitor.[63] Similarly, when a group of stores 
persuaded dress designers and manufacturers not to deal with stores carrying 
competing designs, the Supreme Court used a per se analysis, refusing to 
consider evidence that the boycott was reasonable and procompetitive.[64] 
Even if 
Coke’s conduct were considered a vertical boycott and the rule of reason 
applied, no elaborate industry analysis would be required to demonstrate the 
anticompetitive nature of these agreements. “Absent some countervailing 
procompetitive virtue . . . an agreement limiting consumer choice by impeding 
the ‘ordinary give and take of the market place,’ cannot be sustained under the 
Rule of Reason.”[65] There may be good business reasons to 
limit soft drink brands in airplane cabins or fast-food franchises, but there is 
no evidence that is true of the supermarkets and convenience stores here. While 
businesses may generally make vertical agreements about whose products to carry 
without proferring a business reason, a monopolist like Coke cannot impose such 
a regime when it makes “an important change in a pattern of distribution that 
had originated in a competitive market and had persisted for several years.”[66] Coke advances no credible argument 
for the proposition that giving consumers fewer choices enhanced competition.[67] 
C. Advertising Ban
In many of 
Coke’s agreements, retailers had to agree not to advertise any other soft drinks 
— inside and or outside the store, in circulars, banners, or signs of any kind, 
or even signs that merely stated the price. 
This ban too 
is illegal per se: “[a] concerted and effective effort to withhold (or make more 
costly) information desired by consumers for the purpose of determining whether 
a particular purchase is cost justified is likely enough to disrupt the proper 
functioning of the price-setting mechanism of the market that it may be 
condemned even absent proof that it resulted in higher prices.”[68] There is an exception for bans on 
price-advertising for professional services, which are subject to rule-of-reason 
analysis because consumers do not have the expertise to compare the quality of 
services offered.[69] But that, of course, is not the case 
with soft drinks. 
Coke’s only 
proffered justification for the ban on advertising is that it did not want a 
competitor’s ads covering up its own. In the first place, some of the ads banned 
(such as newspaper ads and in-store circulars) were paid for by the retailers, 
not Coke. Moreover, Coke’s agreements did not demand that its ads be merely the 
first or the largest or the most visible ads, but the only ads. It is 
hard to imagine any procompetitive reason for banning competing ads, and Coke 
does not offer any.
D. Monopoly
Finally, Coke 
argues that with the exception of the advertising ban, the above activities were 
isolated practices in a few markets involving a few brands for short periods of 
time. But a monopolist cannot corner the market illegally by doing so a little 
bit at a time. 
Under the 
Texas Act, like the Sherman Act, a monopoly claim has two elements: (1) monopoly 
power in the relevant market and (2) willful acquisition, maintenance, or use of 
that power by predatory means or for predatory purposes.[70] As Coke did not contest the first, we 
review the record only for the second. 
The Coke 
distributor here is an international corporation accounting for 77 percent of 
Coke’s worldwide sales. It does not contest that its 75‑80 percent market share 
gave it monopoly power in the Ark-La-Tex region.[71] It required agreements from every 
retailer in the region except Wal-Mart, and the jury could have credited 
evidence that it punished retailers who refused with prohibitive wholesale 
prices. Unlike similar agreements in other parts of the country, Coke’s 
agreements in the Ark-La-Tex region were perennial, covering 80 to 100 percent 
of every year, and extended annually. As Coke concedes, these “special” 
marketing agreements were unlike those that it used in the rest of the nation, 
or those that have been approved by other courts.[72] These facts, plus the nature of the 
agreements noted above, are sufficient to support a jury verdict of 
monopolization.[73]
It was 
neither necessary nor sufficient for the bottlers to show that Coke charged 
monopoly prices. Monopoly pricing is not illegal; indeed, it plays an important 
role in competition, initially by inducing innovation, and later by attracting 
new competitors.[74] Illegal monopolization may exist 
“even though a combination may temporarily or even permanently reduce the price 
of the articles manufactured or sold.”[75]    
Nor did the 
bottlers have to declare bankruptcy to prove their monopolization claim.[76] Instead, they only had to prove that 
Coke’s practices adversely affected competition without a legitimate business 
justification.[77] That they 
did.             

Even under a 
rule-of-reason analysis, it would not be up to us to decide whether Coke’s 
agreements were predatory. As we are reviewing a jury verdict, we must interpret 
the entire record in the light most favorable to the bottlers and give them the 
benefit of all inferences the evidence fairly supports.[78] “[T]he primary purpose of the 
antitrust laws is to protect interbrand competition.”[79] Even if soft drink sales grew 
overall, agreements expressly intended to raise prices and reduce consumer 
choices harm competition.[80] Jurors were entitled to conclude that 
Coke’s agreements were, in several respects, intended to accomplish just 
that.
Evidence of 
perfectly legitimate conduct is no evidence of an antitrust violation.[81] Like federal law, Texas law does not 
give jurors “carte blanche to insist that a monopolist alter its way of 
doing business whenever some other approach might yield greater competition.”[82] But if a dominant competitor can use 
its market power to control its competitors’ prices, advertising, and access to 
consumers — as the Court holds they can — it is hard to see what is left of 
Texas antitrust law.          
E. Damages
The jury 
found that the bottlers’ damages totaled $5,153,898.80. Coke argues this figure 
is inflated because the bottlers did not segregate damages attributable to Coke 
rather than Pepsi (with whom they settled). Further, Coke argues that by simply 
assuming the bottlers’ sales would have grown at the national average for all 
soft drinks, it was required to compensate the bottlers not only for illegal 
conduct, but also for legal conduct or anything else that caused their sales to 
grow less than the national average.
The United 
States Supreme Court has said little about calculating damages in antitrust 
cases, except that verdicts should not be based on speculation or guesswork,[83] that defendants should not profit 
because their own wrongs prevent a more precise computation,[84] and that plaintiffs may use estimates 
and analyses to calculate a reasonable approximation of damages.[85] As it may be impossible to prove what 
markets would have done absent illegal conduct, several federal circuit cases do 
not require a showing of the harm caused by individual acts.[86] And in at least one case, lost 
profits were awarded on the assumption that national sales trends would have 
applied locally.[87]
But the 
problem here is that much of the conduct the bottlers emphasized at trial — 
Coke’s discounts for favorable shelf and display locations — was not illegal at 
all. By mixing valid and invalid elements of damages in a single award over 
Coke’s objection, we cannot tell whether the jury based its award on legal or 
illegal conduct.[88] When the damages evidence included 
both proper and improper items, remand is required to allow segregation of the 
two.[89] 
III. Conclusion
Unlike most 
other statutes, the antitrust laws are like the common law in that “varying 
times and circumstances” may give them “changing content.”[90] Although Texas has had its own 
antitrust statutes since 1889, the Legislature adopted the current law in 1983 
to give Texas courts broader powers and greater flexibility in addressing new 
economic and business conditions.[91] We have addressed the amended law 
only rarely, and never found a violation of it.[92] It is a shame the Court does so again 
today, allowing a monopolist to fix prices, ban consumer ads, and remove 
competing products.
Because 
higher prices and fewer choices injured competition in the Ark-La-Tex region, 
not just Coke’s competitors, I would remand for the bottlers to establish their 
damages. Because the Court does not, I respectfully dissent.
 
_______________________________________
Scott 
Brister
Justice
 
OPINION DELIVERED: October 
20, 2006








[1] See Hilton v. Guyot, 159 U.S. 113, 163 (1895); 
Gannon v. Payne, 706 S.W.2d 304, 306 (Tex. 1986).

[2] See State Farm Mut. Auto. Ins. Co. v. Campbell, 
538 U.S. 408, 421 (2003); BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 
572-73 (1996).

[3] See Phillips Petroleum Co. v. Shutts, 472 U.S. 
797, 822 (1985) (holding states “may not abrogate the rights of parties beyond 
its borders having no relation to anything done or to be done within them”) 
(citation omitted).

[4] See Bigelow v. Virginia, 421 U.S. 809, 824 
(1975) (“A State does not acquire power or supervision over the internal affairs 
of another State merely because the welfare and health of its own citizens may 
be affected when they travel to that State.”).

[5] See Shutts, 472 U.S. at 816 (“There can be no 
injury in applying Kansas law if it is not in conflict with that of any other 
jurisdiction connected to this suit.”); In re AdvancePCS Health L.P., 172 
S.W.3d 603, 606 (Tex. 2005) (per curiam) (holding that in the absence of 
conflicting laws, “there can be no harm in applying Texas law”); Compaq 
Computer Corp. v. Lapray, 135 S.W.3d 657, 672 (Tex. 2004) (same); In re 
J.D. Edwards World Solutions Co., 87 S.W.3d 546, 550 (Tex. 2002) (per 
curiam) (same).

[6] Compaq, 135 S.W.3d at 672 (emphasis 
added).

[7] See Tex. 
R. App. P. 44.1.

[8] In its brief, Coke stated that the issue presented was 
“does the TFEAA apply to agreements that are implemented outside the State of 
Texas and do not affect Texas consumers?” Similarly, the court of appeals said 
that “Coke contends the trial court erred in its extraterritorial application of 
the Texas Free Enterprise and Antitrust Act . . . [to] retail establishments 
outside the State of Texas.” 111 S.W.3d 287, 294 (Tex. App.–Texarkana 
2003).

[9] Tex. R. 
Evid. 202 (“A court upon its own motion may, or upon the motion of a 
party shall, take judicial notice of the constitutions, public statutes, rules, 
regulations, ordinances, court decisions, and common law of every other state, 
territory, or jurisdiction of the United States.”).

[10] Olin Guy Wellborn III, Judicial Notice Under Article 
II of the Texas Rules of Evidence, 19 St. Mary’s L.J. 1, 27 
(1987).

[11] Tempel v. Dodge, 33 S.W. 222, 222 (Tex. 
1895).

[12] See Gen. Chem. Corp. v. De La Lastra, 852 S.W.2d 
916, 920 (Tex. 1993); Gevinson v. Manhattan Constr. Co., 449 S.W.2d 458, 
465 n. 2 (Tex. 1969); Ogletree v. Crates, 363 S.W.2d 431, 435 (Tex. 
1963); S. Pac. Co. v. Porter, 331 S.W.2d 42, 45 (Tex. 1960); State v. 
Thomasson, 275 S.W.2d 463, 464 (Tex. 1955); Massachusetts v. Davis, 
168 S.W.2d 216, 220 (Tex. 1943); Abeel v. Weil, 283 S.W. 769, 776 (Tex. 
1926); Ferguson‑McKinney Dry Goods Co. v. Garrett, 252 S.W. 738, 742 
(Tex. Comm’n App. 1923, holding approved); Nevill v. Gulf, C. & S. F. Ry. 
Co., 244 S.W. 980, 984 (Tex. Comm’n App. 1922, holding approved); Am. 
Nat. Bank of Oklahoma v. Garland, 235 S.W. 562, 564 (Tex. Comm’n App. 1921, 
judgment adopted); Lamb v. Hardy, 211 S.W. 445, 446 (Tex. 1919); W. 
Union Tel. Co. v. Bailey, 196 S.W. 516, 518 (Tex. 1917); Nat’l Bank of 
Commerce v. Kenney, 83 S.W. 368, 369 (Tex. 1904); Rivera v. White, 63 
S.W. 125, 126 (Tex. 1901); Gill v. Everman, 59 S.W. 531, 532 (Tex. 1900); 
Blethen v. Bonner, 53 S.W. 1016, 1016 (Tex. 1899); Burgess v. W. Union 
Tel. Co., 46 S.W. 794, 795 (Tex. 1898); S. Ins. Co. of New Orleans v. 
Wolverton Hardware Co., 19 S.W. 615, 615 (Tex. 1892); James v. James, 
16 S.W. 1087, 1089 (Tex. 1891); Abercrombie v. Stillman, 14 S.W. 196, 197 
(Tex. 1890); Houston & T.C. Ry. Co. v. Baker, 57 Tex. 419, 422 (Tex. 
1882); Porcheler v. Bronson, 50 Tex. 555, 561 (Tex. 1879); Armendiaz 
v. De La Serna, 40 Tex. 291, 297 (Tex. 1874); Green v. Rugely, 23 
Tex. 539, 544-45 (Tex. 1859); Moseby v. Burrow, 52 Tex. 396, 405 (Tex. 
1880); Bradshaw v. Mayfield, 18 Tex. 21, 30 (Tex. 1856).

[13] See, e.g., Crane v. State, 786 S.W.2d 338, 347 
(Tex. Crim. App. 1990); Langston v. State, 776 S.W.2d 586, 587 (Tex. 
Crim. App. 1989); Smith v. State, 683 S.W.2d 393, 406 (Tex. Crim. App. 
1984); Acosta v. State, 650 S.W.2d 827, 828 (Tex. Crim. App. 1983); 
Hall v. State, 619 S.W.2d 156, 158 (Tex. Crim. App. 1980); Ex parte 
Nichols, 604 S.W.2d 81, 82 (Tex. Crim. App. 1980); Almand v. State, 
536 S.W.2d 377, 379 (Tex. Crim. App. 1976); McKinney v. State, 505 S.W.2d 
536, 541 (Tex. Crim. App. 1974); Jackson v. State, 494 S.W.2d 550 (Tex. 
Crim. App. 1973); Ford v. State, 488 S.W.2d 793, 795 (Tex. Crim. App. 
1972); Doby v. State, 454 S.W.2d 411, 413‑14 (Tex. Crim. App. 1970); 
Watts v. State, 430 S.W.2d 200, 202 (Tex. Crim. App. 1968); Holcombe 
v. State, 424 S.W.2d 635, 637 (Tex. Crim. App. 1968); Melancon v. 
State, 367 S.W.2d 690, 692 (Tex. Crim. App. 1963); Dillard v. State, 
218 S.W.2d 476, 478 (Tex. Crim. App. 1949); McDonald v. State, 136 S.W.2d 
816, 818 (Tex. Crim. App. 1940).

[14] See Tex. R. Evid. 202 (noting that judicial 
notice of the laws of other states “may be taken at any stage of the 
proceeding”).

[15] ___ S.W.3d at ___.

[16] See Dorothy M. Allison, Physician 
Retaliation: Can the Physician-Patient Reltionship Be Protected?, 94 Dick. L. Rev. 965, 979 n.122 (1990) 
(noting that “[s]tate antitrust laws are usually patterned after the federal 
statute,” and citing the Texas statute as an example).

[17] 15 
U.S.C. §§ 1, 2.

[18] Tex. Bus. & 
Com. Code § 15.05(a)–(b).

[19] La. Rev. 
Stat. §§ 51:122(A), 51:123.

[20] 79 Okla. Stat. 
tit. 79 § 203(A)–(B).

[21] Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 
544 U.S. 280, 292 (2005).

[22] See, e.g., Bryant v. United Shortline Inc. Assurance 
Services, N.A., 972 S.W.2d 26, 30-31 (Tex. 1998) (holding comity did not 
require Texas courts to defer to Tennessee litigation); Christensen v. 
Integrity Ins. Co., 719 S.W.2d 161, 163 (Tex. 1986) (holding comity 
prevented Texas court from enjoining similar California litigation); Gannon 
v. Payne, 706 S.W.2d 304, 307 (Tex. 1986) (holding comity prevented Texas 
court from enjoining related Canadian litigation).

[23] Colorado River Water Conservation Dist. v. U.S., 
424 U.S. 800, 814 (1976).

[24] See State v. Thomasson, 275 S.W.2d 463, 
464 (Tex. 1955).

[25] See Massachusetts v. Davis, 168 S.W.2d 216, 220 
(Tex. 1942).

[26] See Rivera v. White, 63 S.W. 125, 126 (Tex. 
1901).

[27] See Ogletree v. Crates, 363 S.W.2d 431, 435 
(Tex. 1963).

[28] See Byrd v. Crazy Water Co., 140 S.W.2d 334, 336 
(Tex. Civ. App.‑Dallas 1940, no writ) (presuming antitrust laws of California 
the same as those of Texas); J.R. Watkins Co. v. McMullan, 6 S.W.2d 823, 
824 (Tex. Civ. App.‑Austin 1928, no writ) (presuming antitrust laws of Oklahoma 
the same as those of Texas).

[29] See ___ S.W.3d at ___.

[30] See 15 U.S.C. § 6a (providing that Sherman Act 
shall not apply to foreign trade except for claims arising from conduct with a 
direct, substantial, and reasonably foreseeable effect on American imports or 
internal commerce). 

[31] See Kevin O’Malley, Notes & Comments, 
Does U.S. Antitrust Jurisdiction Extend to Claims of Independent/Dependent 
Foreign Injury?, 20 Temp. Int’l 
& Comp. L.J. 219, 239 (2006) (noting § 6a was intended to encourage 
American businesses to compete in foreign markets by means that, although 
illegal here, were lawful there). 

[32] See Hartford Fire Ins. Co. v. California, 509 
U.S. 764, 795-96 (1993).

[33] See id. at 798-99 (holding that foreign insurers 
actions, although legal under British law, could be sued under Sherman Act in 
American courts because insurers could have complied with the laws of both 
countries).

[34] Tex. Bus. & 
Com. Code § 15.04; see Abbott Lab., Inc. v. Segura, 907 S.W.2d 
503, 505 (Tex. 1995).

[35] Tex. Bus. & 
Com. Code § 15.04.

[36] Id. 
§ 15.25(b).

[37] See Gulf Oil v. Gilbert, 330 U.S. 501, 508‑09 
(1947); Flaiz v. Moore, 359 S.W.2d 872, 875 (Tex. 1962); see also 
Tex. Civ. Prac. & Rem. Code § 
71.051.

[38] See Quackenbush v. Allstate Ins. Co., 517 U.S. 
706, 722 (1996) (“The dispute in Gulf Oil was over venue, not 
jurisdiction . . .”); Am. Dredging Co. v. Miller, 510 U.S. 443, 453 
(1994) (“At bottom, the doctrine of forum non conveniens is nothing more or less 
than a supervening venue provision . . .”). 

[39] See Marrese v. Am. Acad. of Orthopaedic 
Surgeons, 470 U.S. 373, 379 (1985) (noting that “federal antitrust claims 
are within the exclusive jurisdiction of the federal courts . . 
.”).

[40] See State Oil Co. v. Khan, 522 U.S. 3, 10 
(1997); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 680 (Tex. 
1990).

[41] See State Oil, 522 U.S. at 
10.

[42] See id.; NYNEX Corp. v. Discon, Inc., 525 
U.S. 128, 133 (1998); N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 
(1958).

[43] Catalano, Inc. v. Target Sales, Inc., 446 U.S. 
643, 649 (1980).

[44] Texaco Inc. v. Dagher, 126 S.Ct. 1276, 1279 
(2006) (citations omitted).

[45] N. Pac., 356 U.S. at 5 (citations 
omitted).

[46] See Verizon Communications Inc. v. Law Offices of 
Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004).

[47] See DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 
688 (Tex. 1990) (“To establish a violation under the rule of reason, one must 
prove that the agreement has an adverse effect on competition in the relevant 
market.”).

[48] See F.T.C. v. Superior Court Trial Lawyers 
Ass’n, 493 U.S. 411, 433 (1990); Arizona v. Maricopa County Med. 
Soc’y, 457 U.S. 332, 344 (1982); Nat’l Soc’y of Prof’l Engineers v. 
United States, 435 U.S. 679, 692 (1978).

[49] See F.T.C., 493 U.S. at 433.

[50] See BMC Software Belgium, N.V. v. Marchand, 83 
S.W.3d 789, 794 (Tex. 2002) (“If the reviewing court determines a conclusion of 
law is erroneous, but the trial court rendered the proper judgment, the 
erroneous conclusion of law does not require reversal.”).

[51] Catalano, Inc. v. Target Sales, Inc., 446 U.S. 
643, 647 (1980) (“It has long been settled that an agreement to fix prices is 
unlawful per se.”).

[52] Id.

[53] “Horizontal” agreements are generally those among 
competitors, while “vertical” agreements are those between firms at different 
levels of distribution, such as a supplier and customer. See NYNEX Corp. v. 
Discon, Inc., 525 U.S. 128, 136 (1998); Bus. Electronics Corp. v. Sharp 
Electronics Corp., 485 U.S. 717, 730 (1988).

[54] State Oil Co. v. Khan, 522 U.S. 3, 17-18 
(1997).

[55] Id. at 15.

[56] Id. (noting that “arrangements to fix minimum 
prices . . . remain illegal per se”); see also Texaco Inc. v. 
Dagher, 126 S. Ct. 1276, 1279 (2006) (“[H]orizontal price‑fixing agreements 
fall into the category of arrangements that are per se 
unlawful.”).

[57] Id.; Catalano, 466 U.S. at 
647.

[58] See United States v. Socony‑Vacuum Oil Co., 310 
U.S. 150, 223 (1940) (holding agreement among competitors to buy gasoline on the 
spot market to prevent prices from falling sharply was per se unlawful, even 
though there was no direct agreement on the actual prices to be 
maintained).

[59] See, e.g., Khan v. State Oil Co., 
93 F.3d 1358, 1361-62 (8th Cir. 1996), vacated, 522 U.S. 3 (1997). 


[60] See Hartford Fire Ins. Co. v. California, 509 
U.S. 764, 802-03 (1993) (defining boycott as refusing to deal in one transaction 
as means of leverage in unrelated transaction).

[61] See Nw. Wholesale Stationers Inc. v. Pac. 
Stationery, 472 U.S. 284, 294 (1985); see also F.T.C. v. Indiana 
Fed’n of Dentists, 476 U.S. 447, 458 (1986) (“[T]he per se approach 
has generally been limited to cases in which firms with market power boycott 
suppliers or customers in order to discourage them from doing business with a 
competitor.”).

[62] See NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 
136-37 (1998).

[63] See Klor’s, Inc. v. Broadway‑Hale Stores, Inc., 
359 U.S. 207, 209-10 (1959).

[64] See Fashion Originators’ Guild of Am., Inc. v. 
F.T.C., 312 U.S. 457, 467-68 (1941).

[65] F.T.C. v. Indiana Fed’n of Dentists, 476 U.S. 
447, 459 (1986) (citations omitted).

[66] Aspen Skiing Co. v. Aspen Highlands Skiing 
Corp., 472 U.S. 585, 603 (1985).

[67] See Indiana Fed’n of Dentists, 476 U.S. at 459 
(finding dentists’ agreement to refuse x-rays to patients’ insurers had no 
procompetitive justification and failed rule of reason test).

[68] Id. at 461-62.

[69] See California Dental Ass’n v. F.T.C., 526 U.S. 
756, 771-72 (1999).

[70] Verizon Communications Inc. v. Law Offices of Curtis 
V. Trinko, LLP, 540 U.S. 398, 407 (2004); Aspen Skiing Co., 
472 U.S. at 602; Caller‑Times Publ’g Co. v. Triad Communications, Inc., 
826 S.W.2d 576, 580 (Tex. 1992).

[71] See, e.g., Eastman Kodak Co. v. Image Technical 
Services, Inc., 504 U.S. 451, 481 (1992) (holding evidence that defendant 
controlled 80 to 95 percent of relevant market created fact issue for jury as to 
monopoly power).

[72] See RJR Tobacco Co. v. Phillip Morris USA Inc., 
67 F. App’x 810, 811-12 (4th Cir. 2003), aff’g 199 F. Supp. 2d 362, 397 
(M.D.N.C. 2002) (upholding agreement that granted supplier best display areas, 
but did not forbid other products, displays, or competitive pricing); Bayou 
Bottling Inc. v. Dr Pepper Co., 725 F.2d 300, 304 (5th Cir. 1984) (upholding 
agreement offering free maintenance on retailer’s machines if stocked only with 
defendants’ products); El Aguila Food Products Inc. v. Gruma Corp., 301 
F. Supp. 2d 612, 631-32 (S.D.Tex. 2003) (upholding marketing agreement by 
supplier without market power); Louisa Coca‑Cola Bottling Co. v. Pepsi‑Cola 
Metro. Bottling Co., 94 F. Supp. 2d 804, 815-16 (E.D. Ky. 1999) (upholding 
non‑exclusive marketing agreement); Frito‑Lay, Inc. v. Bachman Co., 659 
F. Supp. 1129, 1134 (S.D.N.Y. 1986) (upholding 17‑week agreement that guaranteed 
supplier shelf space equal to its market share); Beverage Mgmt., Inc. v. 
Coca‑Cola Bottling Corp., 653 F. Supp. 1144, 1157-58 (S.D. Ohio 1986) 
(upholding agreement that granted supplier without market power exclusive ads 
for half of year). 

[73] Eastman Kodak Co., 504 U.S. at 482-83; Aspen 
Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 610-11 (1985); 
see also Am. Tobacco Co. v. United States, 328 U.S. 781, 810 (1946) 
(“Neither proof of exertion of the power to exclude nor proof of actual 
exclusion of existing or potential competitors is essential to sustain a charge 
of monopolization under the Sherman Act.”).

[74] See Verizon Communications, 540 U.S. at 
407.

[75] Fashion Originators’ Guild of Am., Inc. v. 
F.T.C., 312 U.S. 457, 467 (1941).

[76] See Lorain Journal Co. v. United States, 342 
U.S. 143, 153 (1951).

[77] See Aspen Skiing Co., 472 U.S. at 607-610 
(affirming jury verdict based on evidence that consumers complained about 
discontinuation of multi-mountain lift tickets, and absence of legitimate 
business justification for the decision).

[78] Id. at 604.

[79] State Oil Co. v. Khan, 522 U.S. 3, 15 (1997); 
see also Volvo Trucks N. Am., Inc. v. Reeder‑Simco GMC, Inc., 126 S. Ct. 
860, 872 (2006).

[80] See Conwood Co., L.P. v. U.S. Tobacco Co., 290 
F.3d 768, 789 (6th Cir. 2002) (“Thus, although [sales] in the moist snuff market 
grew, there was evidence showing that [the defendant’s] actions caused higher 
prices and reduced consumer choice, both of which are harmful to 
competition.”).

[81] See Bus. Electronics Corp. v. Sharp Electronics 
Corp., 485 U.S. 717, 726 (1988) (holding antitrust evidentiary standard 
should not “deter or penalize perfectly legitimate conduct”).

[82] Verizon Communications Inc. v. Law Offices of Curtis 
V. Trinko, LLP, 540 U.S. 398, 415-16 (2004).

[83] See Bigelow v. RKO Radio Pictures Inc., 327 U.S. 
251, 264 (1946).

[84] See id.

[85] See Eastman Kodak Co. of New York v. S. Photo 
Materials Co., 273 U.S. 359, 379 (1927).

[86] See, e.g., New York v. Julius Nasso Concrete 
Corp., 202 F.3d 82, 88‑89 (2d Cir. 2000); Pierce v. Ramsey Winch Co., 
753 F.2d 416, 435-38 (5th Cir. 1985); Lehrman v. Gulf Oil Corp., 464 F.2d 
26, 32 (5th Cir. 1972).

[87] See Bob Willow Motors, Inc. v. Gen. Motors 
Corp., 872 F.2d 788, 798 (7th Cir. 1989).

[88] See Harris County v. Smith, 96 S.W.3d 230, 234 
(Tex. 2002); accord, Coastal Fuels of Puerto Rico, Inc. v. Caribbean 
Petroleum Corp., 79 F.3d 182, 200-01 (1st Cir. 1996) (holding reversal of 
monopolization claim required new trial on damages from price-discrimination 
claim).

[89] See Smith, 96 S.W.3d at 236; Minnesota Mining 
and Mfg. Co. v. Nishika Ltd., 953 S.W.2d 733, 739 (Tex. 1997); Texarkana 
Mem’l Hosp., Inc. v. Murdock, 946 S.W.2d 836, 841 (Tex. 1997); Stewart 
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10‑12 (Tex. 
1991).

[90] Bus. Electronics Corp. v. Sharp Electronics 
Corp., 485 U.S. 717, 731 (1988).

[91] See Caller‑Times Publ’g Co. v. Triad Communications, 
Inc., 826 S.W.2d 576, 580 (Tex. 1992).

[92] See Abbott Laboratories, Inc. v. Segura, 907 
S.W.2d 503, 507 (Tex.1995); Caller‑Times, 826 S.W.2d at 588; DeSantis 
v. Wackenhut Corp., 793 S.W.2d 670, 688 (Tex. 
1990).